**PETER et al. v. FIRST NAT. BANK OF LA GRANGE.**

No. 8214.

Court of Civil Appeals of Texas. Austin.

March 19, 1936.

Rehearing Denied April 8, 1936.

L. D. Brown, of La Grange, Jacques P. Adoue, of Houston, Fred L. Blundell, of Lockhart, and Wm. O. Bowers, Jr., of Beaumont, for appellants.

C. D. Krause and Edw. H. Moss, both of La Grange, and J. W. Ragsdale and Edw. ·C. Thomas, both of Victoria, for appellee.

BAUGH, Justice.

Appellee, hereafter referred to as the bank, sued R. J. Peter and M. N. Peter as makers, and Jake Alexander as indorser, on six promissory notes for the sum of $2,500 each, dated February 21, 1930, a part of which were past due and the others declared due by the bank under the accelerating maturity provisions thereof. The appellants pleaded want of consideration, and by cross-action sought to recover moneys already paid on the series of which the notes sued upon were a part; and also sought, for the same reason, cancellation of another series of notes executed by them to the bank at the same time and a part of the same transaction. They also sought to recover exemplary damages against the bank, alleging that through its unlawful conduct it had wrecked the business of the Peter Company, a corporation.. Trial was to a jury, but at the close of the evidence the court instructed a verdict for the bank against the appellants, and judgment was rendered accordingly; hence this appeal.

The notes in question were executed in settlement of indebtedness claimed by the bank against the Peter Company incurred from November 23, 1928, to April 27, 1929, and arose in the following manner: The Peter Company, under the management and control of R. J. and M. N. Peter, who owned most of the capital stock of same, was a dealer in eggs, poultry, and other produce at La Grange, Tex. In the fall of 1928 they began a course of dealing with the New York Buyers Association, a corporation, of San Antonio, Tex., engaged in a similar business, whereby the New York Buyers Association would sell and ship produce in carload lots to purchasers in Chicago and New York, and draw drafts for the sale price thereof on the Peter Company through appellee bank at La Grange, often without any bills of lading attached. These drafts the Peter Company would pay by its own check when presented and then itself draw drafts on the parties designated by the New York Buyers Association in Chicago or New York, which were deposited as cash items in the La Grange bank to the credit of the Peter Company. If the drafts drawn by the Peter Company on these foreign concerns were dishonored, they were then charged back by the bank against the Peter Company. Under this method of doing business, in a period of a few months the New York Buyers Association had drawn more than a million dollars in drafts on the Peter Company which had been paid by it by checks on the La Grange bank. The result of such hazardous method of doing business was that by April 27, 1929, the bank had on hand approximately $184,000 in dishonored drafts drawn by the Peter Company on New York and Chicago concerns, all of which had been credited as cash to the Peter Company and by it checked out to the New York Buyers Association of San Antonio. As might be expected, the La Grange bank closed its doors on April 27, 1929.

Thereafter, on February 21, 1930, the bank made a settlement agreement in writing with R. J. and M. N. Peter individually, on all said transactions, whereby in consideration of the execution and delivery to it by appellants herein of notes aggregating $50,000 it released the Peter Company and its officers and stockholders from all liability on said dishonored drafts and dishonored checks, and delivered same over to the Peter Company. The notes here involved are the ones so executed. The amount of such dishonored drafts drawn by the Peter Company, together with checks given the Peter Company by the New York Buyers Association and credited to it by the bank, payment of which had been refused, aggregated $194,-

880.35, which sum was credited with $45,-000 in notes executed by the New York Buyers Association, or for its benefit, leaving a balance due by the Peter Company to the bank of $149,880.35.

The want of consideration for said notes pleaded by appellants was, in effect, that the arrangements and transactions above outlined, and out of which the indebtedness sued upon arose, were made, entered into, and carried out by the bank with the New York Buyers Association for the benefit and profit of the bank; that the Peter Company derived nothing from such transactions; that the Peter Company's officers, R. J. and M. N. Peter, trusted the bank to protect the Peter Company's interest and comply with the banking laws; but that the bank negligently and willfully failed to do so, but conducted said transactions for its own benefit and in violation of the banking laws, with the result that it wrecked the Peter Company.

The only real issue in this case is whether a valid consideration existed for the execution of the notes sued on. The first contention made by appellants is that the great weight and preponderance of the evidence showed a failure of consideration, or at least made a jury issue of that question.

As to the Peter Company's part in the transaction involved, only Robert J. Peter testified. His testimony was that the Peter Company received nothing from these transactions. It seems inconceivable that a business concern would lend its credit without profit, or without security against loss, to another concern in another city to the extent of more than a million dollars over a period of five months, or that a bank through which such transactions were carried on would permit it do so. Yet that is what the testimony of R. J. Peter affirmatively shows to have been done in this case. Numerous drafts were drawn by New York Buyers Association on the Peter Company through appellee bank without bills of lading or anything · attached. These drafts the Peter Company uniformly accepted, issued its own checks in payment, and reimbursed itself by drawing open drafts on the parties indicated by the New York Buyers Association in Chicago or New York. These drafts were deposited by the bank to the credit of the Peter Company as cash items, and funds remitted to the New York Buyers Association at San Antonio on the Peter Com-

pany's check to that association, without knowing whether the drafts drawn by the Peter Company would be honored or not. While the allegations in appellants' answers were sufficient to raise the issue of fraud by the bank on the Peter Company and want of consideration for the notes, the evidence clearly negatives such allegations. The Peter Company at all times knew exactly how the transactions were being handled, issued its own checks to pay the drafts upon it, and itself drew the drafts upon the concerns in New York and Chicago. When it was notified by the bank in January that some $109,000 of its drafts had not been paid, it took the matter up with the drawees of such drafts to secure their payment. When further drafts drawn by it were dishonored and the bank pressed the matter, a conference was had at La Grange about February 8, 1929, between the officers of the Peter Company, the cashier of the bank, and the president of the New York Buyers Association, with reference to then outstanding unpaid drafts, in which the president of the New York Buyers Association assured them that he would see that these drafts so drawn by the Peter Company were paid. Thereafter these transactions continued in the same manner with the full knowledge of the Peter Company until the bank closed its doors. Not only was this true, but in February, 1931, the managing officers of the Peter Company, with full knowledge of what had transpired, and that the bank was holding it responsible on these dishonored drafts, entered into the settlement agreement with the bank, procured a complete release from the bank of all liability on such dishonored drafts both against it and its officers and stockholders, and had delivered to them all of said unpaid drafts. Later when the New York Buyers Association, which had received the benefits of all such drafts, was adjudged a bankrupt, the Peter Company presented its claims against said association, aggregating some $253,000, which included the drafts delivered to it by the bank, and in a settlement made with the approval of the court this claim was allowed for the sum of $100,000, and a dividend of $4,000 paid thereon to the Peter Company.

So far as the record discloses, the Peter Company was under no obligation to accept the drafts drawn upon it by the New York Buyers Association, but

it chose to do so uniformly. When it drew drafts on others through the appellee bank, received credit therefor, and these drafts were dishonored, the Peter Company became liable to the bank for their payment under the express provisions of the statute. Article 567, R.S.1925; Harper v. Winfield State Bank (Tex.Civ.App.) 173 S.W. 627. Whatever grievance, if any, it may have had against the bank as to the manner in which these transactions were handled, should have been asserted when the settlement, out of which said notes were executed, was had. That it relied upon the bank, if it did so, to protect its interests, is no defense, absent fraud which was not shown, to a legal liability incurred by its voluntary conduct and fixed by statute. That the bank made large concessions to the Peter Company in procuring the settlement agreement is manifest. There existed a legal liability against the Peter Company of approximately $150,000. This was adjusted, and the Peter Company, its officers and stockholders, were released from all liability in consideration of the execution of $50,000 in notes, accepted such release, together with the dishonored drafts, and undertook to collect them. Whether the release contract under which appellants executed said notes be treated as a novation of the debt in favor of the bank against the Peter Company, or as a ·compromise agreement of the controversy undertaken to be set up in this suit, the result is the· same in either event. Having accepted such release and discharge by the bank, appropriated its benefits, and acted under it with full knowledge of the facts, the Peter Company is bound by it and.cannot now be heard to assert any invalidity thereof.

But appellants R. J. and M. N. Peter contend that the dishonored drafts constituted a debt only against the corporation and not against them individually; and that there was therefore no consideration for the execution by them of their individual notes to pay or settle the corporation's debt. This contention is predicated upon the holding in Witt v. Wilson (Tex.Civ. App.) 160 S.W. 309, followed in First Nat. Bank v. Shaw (Tex.Civ.App.) 260 S. W. 309, 312. However, the rule there announced is not ·applicable to the instant case. There the original debt was not extinguished. In the instant case it was. As a general rule mere ownership of stock in a corporation, where the stockholder is not individually liable for the debt of the cor-

poration, there being no other consideration, is not in itself any consideration to support the assumption by such stockholder individually of the corporation's debt. Especially is this true where the debt against the corporation is not thereby extinguished.

But where there exists a valid indebtedness against a corporation, and there is a complete novation wherein an extension of time is given, and the debt against the corporation is extinguished, an assumption of such debt by a stockholder as his individual obligation has been held to be supported by a valid consideration. Gauss-Langenberg Hat Co. v. Alley (Tex.Civ. App.) 154 S.W. 1062, 1063. And the general rule is that the officers and directors of a ·corporation may be held liable for tortious acts of the corporation where they participated therein in their official capacities, or such acts were performed at their instance. This is especially true where they have undertaken to do so by written contract. 14a C.J. 172; 10 Tex.Jur. § 169, p. 799; 11 Tex.Jur. § 364, p. 10, § 368, p. 15.

In the instant case the release agreement, pursuant to which said notes were executed, was offered in evidence by appellants themselves without restriction. Consequently they are bound by its recitals. These recitals were, among others, 'that appellee bank contemplated bringing suit against the Peter Company and the makers of said notes individually and jointly for damages resulting from tort. Manifestly that was a moving consideration to appellants in making such settlement and executing said notes, for, as alleged by appellants in their answers, the corporation of which such makers were officers and directors and holders of most of the stock had already been wrecked and was doubtless insolvent at the time. These facts and circumstances constituted, we think, a valid consideration for the notes in question.

.Nor do we think the fact that appellee bank in its settlement and release contract with appellants reserved the right to sue other tort-feasors, if any, to reimburse itself for the losses suffered, has any bearing on the liability of appellants on said notes. These notes represented only about one-third of the bank's loss in the premises; and whatever may have been the effect as to others who might be jointly liable with appellants, if such liability existed, the release as to the Peter Company

and appellants from all liability for such transactions was complete and unequivocal. They are, therefore, in no position to complain. And whatever may have been the fault or negligence of the bank in permitting such unsound and unbusinesslike transactions to continue, it was done with the full knowledge and consent of the Peter Company, and of R. J. and M. N. Peter; and the rights of the respective parties settled and foreclosed by the voluntary agreement made in writing and accepted by them on February 21, 1930. This agreement was complete and unambiguous on its face, binding on the parties, and needed no extraneous evidence to explain it. As such, therefore, the only question presented is the legal effect of such instrument, a matter for the court to determine and not the jury. Moore v. Wooten (Tex. Com.App.) 280 S.W. 742, 747; Cooper Grocery Co. v. Strange (Tex.Com.App.) 18 S.W.(2d) 609.

Under the view we take of the case, and the uncontroverted evidence, we think the whole matter was foreclosed when the settlement was made in February, 1931, and the notes executed. Conceding that the bank reaped a profit by charging exchange on the transactions, we find no evidence that any fraud was perpetrated on either the Peter Company or its officers and directors. They were fully cognizant of the facts, knew all along that the bank was holding the Peter Company responsible on the dishonored drafts, yet continued the same course of dealing by paying such drafts drawn by the New York Buyers Association, and taking their chances on being reimbursed by drawing drafts on other designated parties. The liability thus, under the statute, became primarily that of the Peter Company, even though the bank was negligent in permitting such a course of dealing. Such negligence was not only permitted, but made possible by the acts of the Peter Company, and fully approved by it after the losses began to occur. Hence the Peter Company was in no position to complain.

Consequently, under the undisputed facts, we think it is not material what the books of the bank showed with reference to how the individual transactions were carried. The facts above set forth are not materially controverted, but substantially admitted by R. J. Peter in his testimony. It was not error, therefore, to exclude as evidence the bank's books offered by appellants.

It follows, of course, that if appellants were liable on the notes sued upon, their cross-action must necessarily fall.

While we have not undertaken to consider all of the assignments presented, nor to discuss the authorities cited in support thereof, what we have considered is determinative of the controlling issues presented. The judgment of the trial court is affirmed.

Affirmed.