Mary Schwartz **SUTTON** and **C. R.**
*Sutton, Jr., Appellants,*

v.

**REAGAN & GEE et al., Appellees.**

No. 14423.

Court of Civil Appeals of Texas.

San Antonio.

May 18, 1966.

Rehearing Denied Sept. 7, 1966.

**830**

Matthews, Nowlin, Macfarlane & Barrett, F. W. Baker, San Antonio, for appellants.

Morriss, Boatwright, Lewis & Davis, San Antonio, for appellees.

CADENA, Justice.

This suit was filed by appellees, Reagan & Gee, a partnership composed of Cecil Reagan and Clifford Gee, and Reagan and Gee individually, against Louis M. Schwartz, Mary Schwartz Sutton, C. R. Sutton, Jr., and Charles E. Reed. The four defendants were the officers, directors and shareholders of L. Schwartz Company, a corporation which ceased doing business on April 19, 1960, and which has been declared bankrupt. The claims of appellees grew out of the delivery of mohair to the corporation in April, 1960, a few days before the company closed its doors. After trial to a jury, the district court entered judgment in favor of appellees against all defendants in amounts totaling $16,427.17, and awarded the defendants Mary Schwartz Sutton, C. R. Sutton, Jr., and Charles E.

Reed, judgment over against Louis M. Schwartz. Only Mary Schwartz Sutton and her husband, C. R. Sutton, Jr., have appealed from this judgment.

The L. Schwartz Company was founded as a sole proprietorship mercantile business in 1878, by the grandfather of Louis Schwartz and Mary Schwartz Sutton. In 1928 the business was incorporated with a stated capital of $225,000.00, subscribed to by twenty-two shareholders. None of the defendants herein owned any stock in the corporation until 1952, when Louis Schwartz and his sister, Mrs. Sutton, acquired, by gift, all of the outstanding stock, with the exception of one share which was held by the person serving as secretary-treasurer of the company.

From 1952 until the company closed its doors on April 19, 1960, Schwartz was president and manager of the corporation, devoting his full time to its affairs. Mrs. Sutton was vice-president but, although she conferred with Schwartz from time to time concerning the business, she spent little time at the company's place of business. From 1952 until February 2, 1960, no formal meeting of the shareholders or of the board of directors was held. Whenever action by the board of directors was required, the problem would be discussed informally. If action in the form of corporate resolution was required, the resolution was prepared by Schwartz and signed by Mrs. Sutton and by the secretary-treasurer. The usual practice was for Schwartz to present the proposed resolution to his sister, Mrs. Sutton, frequently at her home, for her signature, after which the person acting as secretary-treasurer would sign the instrument. No minutes were prepared reflecting these unanimous, albeit informal, actions by the directors.

In 1955 or 1956, Schwartz began speculating in the commodities market, buying commodity futures both in his own name and in the name of the company. In February, 1956, Schwartz, Mrs. Sutton and a Mrs. Cage, who was then secretary-treas-urer, signed a resolution authorizing the company to maintain an account with the brokerage firm of Merrill, Lynch, Pierce, Fenner and Beane (now Merrill, Lynch, Pierce, Fenner and Smith) for the purchase and sale of stocks, bonds or securities, commodities or commodity futures. This authorization was never revoked. In addition to his dealings with the Merrill firm, Schwartz dealt in commodity futures on his own account with other brokers. He used corporate funds to cover his losses. The money thus drawn by Schwartz was charged to his account on the books of the corporation.

Every year since 1952 an independent certified public accountant made a "tax audit" of the corporations' books for the purpose of filing a corporate income tax return. As part of this investigation, the accountant prepared financial statements, copies of which were made available to Mrs. Sutton. Mrs. Sutton noted, in the 1957 financial statement, an entry described as "loss on commodity futures." She discussed the matter with Schwartz, who assured her that he would stop such speculation. Subsequent financial statements of the corporation contained no entries showing a profit or loss from dealings in commodity futures, although the evidence conclusively establishes that Schwartz, despite his assurances to Mrs. Sutton, continued his speculation.

Until February 2, 1960, C. R. Sutton, Jr., a physician with a full-time private practice, was neither an officer, director nor shareholder of the corporation and took no part in the management of its affairs. On that date his wife, Mary Schwartz Sutton, transferred nine shares of stock to him, and that evening a shareholders' meeting was held at which Dr. Sutton was named second vice-president, and elected to the board of directors.

Soon after February 2, 1960, Dr. Sutton engaged Woodrow Ede, a certified public accountant, to examine the books and records of the company and to prepare analyses of the company's operations. According to

Ede, he was unable to compile any tentative figures he could "work with" until March 21, 1960. Some time thereafter Ede prepared and furnished to Dr. Sutton a trial balance sheet as of February 29, 1960. This trial balance contained an entry, as an account receivable under the designation "Merrill, Lynch, Fenner & Smith," of the sum of $124,175.00. All of this amount apparently represented losses resulting from Schwartz's speculations.

The trial balance showing the condition of the company as of February 29, 1960, showed that the assets of the company exceeded its liabilities by more than $57,000.00. However, this balance sheet contained a note pointing out that the Merrill, Lynch account was being carried as an account receivable "pending final decision on whether this will be a corporation or individual loss." At first, Schwartz agreed that he would convey certain property of his to the corporation to secure payment of the amounts owed by him to the corporation. Subsequently, Schwartz reneged on this agreement, and at that time Ede and appellants decided that this account must be carried as a company loss. When the sum of $124,175.00 is deducted from the assets of the corporation, the balance sheet shows that the liabilities of the company exceeded its assets by a substantial sum.

Ede testified that as of March, 1960, Schwartz owed the corporation, on his personal account, the sum of $107,871.00.

After February 2, 1960, Schwartz and Mrs. Sutton each borrowed $60,000.00 by mortgaging ranches owned by them. The $120,000.00 realized from these loans was used for the benefit of the corporation.

Ede testified that he did not determine that the company was insolvent until three or four days before the company closed its doors on April 19, 1960. Until that time, he was of the opinion that it was economically "possible and probable" to keep the business open, and appellants were doing everything possible to see that the business remained open.

The financial collapse of the company was due not only to Schwartz's disastrous venture into the commodity futures market, but also to heavy losses suffered by the company in its operations relating to the purchase and sale of mohair. All contracts relating to the sale and purchase of mohair were handled exclusively by Schwartz. In March, 1960, Schwartz represented to Ede and to appellants that the great bulk of the mohair which the company was obligated to deliver that spring to buyers under contracts negotiated in the fall of 1959 had already been purchased at prices which would enable the company to realize a profit. In fact, as Ede subsequently discovered, only a minor portion of the mohair required to fulfill the company's obligations had been acquired, and the price which Schwartz had obligated the company to pay for such mohair was in excess of the price at which the company had obligated itself to sell it. Schwartz assured Ede that he would be able to acquire the needed mohair in Arizona and New Mexico at prices which would enable the company to fulfill its contractual obligations at a profit. Ede himself advised appellants that the high price of mohair in March was due to the lateness of the shearing season, and that as soon as the growers completed shearing the price would decline. Contrary to Ede's expectations, there was no decline in the price of mohair. As a result, the company suffered heavy losses.

After the company closed its doors on April 19, 1960, several creditors of the corporation, other than appellees, forced it into involuntary bankruptcy.

Appellees' mohair was delivered to the L. Schwartz Company warehouse on April 2 and April 6, 1960. The jury found that such delivery was on consignment, to be sold by the company on a commission basis for the account of appellees. Appellees' mohair was sold by the company, and it is undisputed that appellees did not receive the full proceeds of such sales.

Appellees alleged that appellants and the other two defendants were individually

liable for the conversion of the mohair, or the misappropriation of the proceeds of the sale thereof, for the following reasons:

1. Appellants negligently permitted Schwartz, "during the last year before" the transactions involving appellees' mohair, to appropriate to his own use more than $100,000.00 of corporate funds.

2. Because of the appropriation of corporate funds by Schwartz, the corporation was, and appellants knew it to be, insolvent at the time of the transactions between appellees and the corporation, and appellants wrongfully concealed such insolvency from appellees.

3. Appellants were negligent in failing to see that the proceeds from the sale of appellees' mohair were faithfully accounted for and paid to appellees.

4. Appellants were negligent in (1) permitting the corporation to engage in ultra vires acts; (2) permitting Schwartz to remain as president and manager of the corporation; and (3) permitting the corporation to act as a factor or commission merchant without posting the bond required by Article 1275, Vernon's Ann.Civ.St.

5. The corporate "veil" should be "pierced" because appellants and Schwartz conducted the business of the corporation as though it were owned by them personally, without adopting by-laws or holding meetings of the shareholders or board of directors from 1952 until February 2, 1960.

In addition to finding that the transactions between appellees and L. Schwartz Company constituted consignments of the mohair in question for the purpose of sale, rather than sales thereof to the corporation, the jury found:

1. Mrs. Sutton's negligence in not discovering the extent to which Schwartz was using corporate funds to speculate was the proximate cause of the loss suffered by appellees.

2. Neither of appellants knew that the corporation was insolvent at the time that appellees delivered their mohair, but their negligent failure to discover such fact was the proximate cause of appellees' loss.

3. Until February 2, 1960, Schwartz and Mrs. Sutton each treated the company as though it were owned by them personally, rather than by the corporation.

4. From February 2, 1960, until the company ceased doing business on April 19, 1960, Schwartz, Mrs. Sutton and Dr. Sutton each treated the company as though it were owned by the corporation.

5. From February 2, 1960, until April 19, 1960, Schwartz and Mrs. Sutton each treated the company as though it were owned by them personally.

6. The fact that Schwartz and Mrs. Sutton treated the company as though it were owned by them personally resulted in material injury to appellees.

We do not consider appellants' contention that some of the jury's findings are in conflict with each other, since this point was not raised in their motion for new trial. St. Paul Fire & Marine Ins. Co. v. Murphree, 163 Tex. 534, 357 S.W.2d 744 (1962); Sands Motel v. Hargrave, Tex.Civ.App., 358 S.W.2d 670, wr. ref. n. r. e.

1. *Appellants' Liability for Conversion.*

A corporate officer who converts the property of another to the use of the corporation, or who misapplies private funds in the hands of the corporation is personally liable to the person whose property or funds have been so misappropriated. McCollum v. Dollar, 213 S.W. 259 (Tex.Com.App., 1919). However, there is no such liability for the wrongful act of a co-officer where the person sought to be charged did not participate in the wrongful act and had no knowledge, actual or constructive, thereof. Peter v. First Nat. Bank of LaGrange, Tex.Civ.App., 92 S.W.2d 1079, no writ; Economy Filling Station v. Humble Oil & Ref. Co., Tex.Civ.App., 3 S.W.2d 832, wr. dism.; Santa Barbara v.

Pasquale ˙ Availone & Stefano Miele, 270 N.Y. 1, 199 N.E. 777; 3 Fletcher, Cyclopedia of the Law of Corporations (rev. ed., 1965), §§ ˙ 1140–1141, pp. 794–798. This limitation of liability is but an application of the doctrine that liability of corporate officers and directors does not grow out of the fact that they occupy such positions, but springs out of their participation in the wrong. Belo v. Fuller, 84 Tex. 450, 19 S.W. 616 (1892).

In this case it is undisputed that appellees dealt only with Schwartz, and that the sale of the mohair by the corporation was handled exclusively by Schwartz. There is no testimony connecting appellants with any transaction involving such mohair, nor is it shown that any of the proceeds of the sale thereof came into the hands of appellants and were diverted or misapplied by them. The burden was on appellees to introduce evidence showing that appellants participated in the wrong or that, having actual or constructive knowledge thereof, they failed to prevent it. McCollum v. Dollar, supra. They produced no such testimony.

## 2. Appellants' Liability for Mismanagement.

The findings to the effect that Mrs. Sutton failed to discover the extent to which Schwartz was misappropriating corporate funds for purposes of speculation, and that Dr. and Mrs. Sutton failed to discover the insolvent condition of the corporation at the time that appellees delivered their mohair amount to no more than findings of negligent mismanagement of the corporation's affairs by appellants.

There is considerable confusion in the cases dealing with the problem of directorial liability to creditors for negligent mismanagement of the affairs of the corporation.

All courts seem to agree that a director owes a duty to the corporation to exercise due care in the management of the corporation's affairs. For breach of this duty, the director is clearly liable to the corporation for any loss it may suffer as a result of his neglect. So, also, the director's liability may be enforced by any person who is seeking to assert the claim of the corporation, or of the shareholders collectively, if there is a difference between the two, rather than his own individual claim. Thus, the director may be brought to task by (1) the receiver or trustee in bankruptcy of the corporation, or (2) a shareholder, by way of a representative action, to recover for the loss suffered by the corporation. In addition, under special circumstances not necessary to discuss here, a creditor may, through a creditor's bill brought on behalf of all creditors, enforce the director's liability.

But where, as here, an individual creditor of the corporation brings suit, solely on his own behalf, for negligent mismanagement, agreement disappears. While all courts agree that directors owe a duty of due care to the corporation, it is difficult to find a defensible basis for concluding that directors owe a similar duty to creditors of the corporation. Application of the principles of the law of agency results in a holding that the director is not liable to the corporate creditors for negligent mismanagement, since an agent is not liable to the creditors of his principal for failing in his duty to such principal. Restatement, Agency 2d, § 352 (1957).

Some courts refer to directors as "trustees," rather than agents. But the so-called "trustee" courts are not in accord concerning the director's liability to creditors for mismanagement. This lack of harmony is due to disagreement as to the identity of the cestuis que trustent. Some of these courts allow the creditor to recover on the ground that a director is a trustee not only for the corporation, but also for the creditors. . Anthony v. Jeffress, 172 N.C. 378, 90 S.E. 414. Other "trustee" courts deny the existence of a trustee-cestui que trust relationship between the director and a creditor of the corporation, and, consequently, will

not allow an individual creditor to maintain an action for negligent mismanagement. Webb v. Cash, 35 Wyo. 398, 250 P. 1.

It is difficult to understand the legal reasoning by which a director is converted into a trustee for the creditors of the corporation. It should be apparent that a director who attempts to act as trustee both for the corporation and for third persons who assert claims against such corporation will inevitably be placed in a position involving irreconcilable conflicts of duty, and will be forced to breach his duty to one or the other. This difficulty explains the general rule that a creditor who sues solely on his own behalf cannot maintain a personal action against directors who, by negligent mismanagement of the corporation's affairs, have breached their duty to the corporation to the consequent damage or injury of its creditors. Lawson-Richards, Inc. v. Blalock Lumber Co., 30 S.W.2d 797, wr. dism.; Anno: 50 A.L.R. 462 (1927).

The rule of nonliability of directors to creditors for mismanagement finds support not only in the absence of any rational basis for imposing a duty upon the director to the creditor, but also in the fact that a recovery by an individual creditor in such cases would not bar the right of the corporation to recover from the director. 3 Fletcher, op. cit., § 182. To allow an individual creditor to recover in such a case would result in the imposition of double liability on the director.

Since the breach in mismanagement cases is of a duty owed to the corporation, and the primary injury is to the corporatoin, the right to recover therefor may be regarded as a corporate asset. When the corporation enforces the liability of the director, the amount recovered then becomes available for the benefit of all creditors, all of whom have been similarly, if indirectly, injured. The record in this case discloses that there is now pending an action instituted against these appellants by the corporation's trustee in bankruptcy seeking to recover, on behalf of the corporation, for losses suffered by it due to the mismanagement, if any, by appellants. The amount, if any, which such trustee may recover will be available for use in satisfying the claims of all creditors, including appellees.

The jury's findings of negligent mismanagement, then, will not support a recovery by appellees in this case.

Even if appellants had actual knowledge of the insolvent condition of the corporation, they owed no duty to appellees to volunteer such information. Nor do appellants become subject to liability because they made no effort, prior to the delivery of appellees' mohair, to have the corporation discontinue business. Hart v. Hanson, 14 N.D. 570, 105 N.W. 942, 3 L.R.A., N.S., 438.

There is no jury finding to the effect that appellants were negligent in allowing Schwartz to remain as president and manager of the corporation. In addition, while directors may be held liable if they retain in a responsible position a man who has shown himself dishonest or unworthy of trust, such action involves a breach of duty to the corporation, for which only the corporation or someone suing on its behalf may recover. Graham v. Allis-Chalmers Mfg. Co., 188 A.2d 125 (Del.); La Monte v. Mott, 93 N.J.Eq. 229, 107 A. 462 (aff'd, 93 N.J.Eq. 254, 116 A. 269).

It should also be pointed out that the negligence, if any, of Mrs. Sutton in failing to discover the extent to which Schwartz was misappropriating corporate funds took place before appellees became creditors of the corporation. It is generally held that a creditor may not complain of mismanagement which took place before he became a creditor. In re Franklin Brewing Co., 263 F. 512 (2d Cir.); Skinner v. Hulsey, 103 Fla. 713, 138 So. 769.

### 3. Liability for Ultra Vires Acts.

█ While there is authority to the effect that a director is personally liable if he participates, or allows the corporation to engage, in ultra vires acts, our Supreme Court has held that the doing of an ultra vires act is not a sufficient basis for imposing liability on the officers or directors of the corporation. Staacke v. Routledge, 111 Tex. 489, 241 S.W. 994 (1922).

### 4. Effect of Failure to Hold Meetings.

█ Appellants owed no duty to appellees to hold meetings of the shareholders or board of directors. Their failure to hold such meetings could amount to no more than mismanagement of corporate affairs, and whatever injury resulted from such neglect was primarily an injury to the corporation. Further, where, as here, all the shareholders act together on behalf of the corporation, their action is substantially corporate action, even in the absence of formal meetings or formal votes. Elyea v. Lehigh Salt Min. Co., 169 N.Y. 29, 61 N.E. 992; 14 C.J., Corporations, § 1354, p. 886; 18 C.J.S. Corporations § 539, p. 1223; 19 Am.Jur.2d, Corporations, § 1121, p. 557.

### 5. Liability Based on Absence of Factor's Bond.

Art. 1275, Vernon's Ann.Civ.St., requires that all commission merchants shall make bond, in the sum of $3,000.00, payable to the county judge of each county in which such commission merchant maintains an office, conditioned that the factor will faithfully perform all agreements entered into with persons who have consigned goods to him for the purpose of sale. In this case it is undisputed that, at the time appellees delivered their mohair on consignment to L. Schwartz Company, and for some years prior thereto, the company had failed to furnish the bond required by this statute.

█ The statute contains no provisions making the officers, directors or shareholders of a corporation which does not comply

with the bond requirements personally liable for the debts or obligations of such corporation. The only sanction imposed on persons who fail to comply with Art. 1275 is found in Articles 1125 and 1700a–3 of the Vernon's Ann. Penal Code, which make such non-compliance punishable by fine. Since the Legislature itself has decreed the consequences flowing from non-compliance with Art. 1275, the courts are not free to impose additional penalties or sanctions. 19 C.J.S. Corporations § 966, p. 423.

█ Our holding also finds support in the rule that the failure of a corporation to comply with statutory requirements or conditions precedent to the right to engage in business will not make the officers and directors of the corporation personally liable in the absence of a statutory provision to that effect. Pierce v. Yeaton, 78 N.H. 171, 97 A. 876; 3 Fletcher, op. cit., § 1024.

### 6. Liability Based on "Piercing" of Corporate "Veil."

█ It is a basic rule of the law of corporations that the shareholder is ordinarily insulated from personal liability arising from the activities of the corporation. This insulation from personal liability is said to be the natural consequence of the incorporation process, and is supported by the theory or "fiction" that incorporation results in the creation of an "entity" separate and distinct from the individual shareholders. But the courts have not allowed this concept of a separate entity, useful though it may be in facilitating the achievement of results considered economically desirable, to allow individuals to make use of the corporate form in order to engage in conduct and bring about results which are considered to be in violation of important principles of public policy. In certain cases, the courts, in order to deny insulation from liability, will "disregard" the "corporate entity" which they themselves have created or, speaking more colorfully, will "pierce" the corporate "veil" which the courts have made available to

shareholders for use as a shield from personal liability.

In Pacific American Gasoline Co. of Texas v. Miller, Tex.Civ.App., 76 S.W.2d 833, wr. ref., it was said that the corporate form will be disregarded (1) where it is used as a medium for the perpetration of fraud; (2) where the corporation is organized or conducted as the mere "tool" or "business conduit" of another corporation; (3) where resort is made to the corporate fiction in order to avoid an existing legal obligation; (4) where the corporate form is used to achieve or perpetuate monopoly; (5) where the corporate structure is used as a vehicle for circumventing a statute; or (6) where the fiction is invoked in order to protect crime or justify wrong.

The opinions are replete with statements to the effect that the shareholder will be held liable where he "dominates" the corporation; or where the corporation is a "subterfuge," or "mere creature" or "mere instrumentality" of the shareholder; or where it is a "dummy," "alter ego," "sham," "tool," "buffer," "business conduit," "agent," etc. of the shareholder.

Although such general statements or labels are often referred to as "rules" to be applied in determining whether a particular shareholder will be given the benefit of insulation from personal liability, they are of no help in the solution of specific problems, since they tell us little about the crucial facts which lead to liability. For example, they do not differentiate between the one-man corporation which will be "disregarded" and the one which will be "recognized." While it is difficult to imagine a corporation whose shares are wholly owned by one individual which will not be "dominated" by such individual, the fact that one individual acquires all of the stock of a corporation does not necessarily require that the separate entity theory be ignored. Hake v. Dilworth, Tex.Civ.App., 96 S.W.2d 121, wr. dism.

Whether or not a shareholder will be insulated from personal liability should depend on the use, or misuse, which *that* shareholder is making of the corporate form. The only shareholders who should be held personally liable are those who have used the corporation to bring about results which are condemned by the general statements of public policy which are enunciated by the courts as "rules" which determine whether the courts will recognize their own child.

In this case the facts upon which appellees rely, and which have been outlined in the summary of the corporation's history set out above, cannot be said to indicate that Mrs. Sutton used the corporation as an "alter ego," "sham," "subterfuge," etc. She did not use it as a "cloak" behind which she transacted her own personal business. While it may be that she was derelict in her duty to the corporation, there is nothing to show that she used it as a vehicle for injustice or inequity, or for the purpose of perpetrating a fraud upon appellees or upon any other person. The failure of the company resulted in losses to many persons, including Mrs. Sutton herself, but none of the epithets which are traditionally used to justify the imposition of prsonal liability on shareholders can be fairly applied to her conduct.

Dr. Sutton was not, and had no right to be, active in the affairs of the corporation until about ten weeks before it closed its doors. The record discloses that his activities as an officer, director and shareholder were aimed at the objective of saving a dying company. The fact that he was unsuccessful does not justify the imposition of personal liability on any "veil piercing" theory.

In view of our conclusions concerning the legal rules applicable to this case, we do not consider appellants' points relating to the sufficiency of the evidence to support the findings of the jury.

The trial court erred in entering judgment against appellants. Since the length of the record in this case makes it apparent that the case has been fully developed, it becomes our duty to enter the judgment which the trial court should have rendered. Rule 434, Texas Rules of Civil Procedure.

The judgment of the trial court is reversed and judgment is here rendered that appellees take nothing by their suit against appellants.