IN THE COURT OF APPEALS, THIRD DISTRICT OF TEXAS,



AT AUSTIN




 





NO. 3-90-206-CV





EARL WHITE,



 APPELLANT


vs.





EGGHEAD ENTERPRISES, INC., RONALD CRAIG McGUIRE,


INDIVIDUALLY AND FIRST CITY NATIONAL BANK OF


SAN ANGELO, AS TRUSTEE OF THE RONALD CRAIG


McGUIRE TRUST,




 APPELLEES



 




FROM THE DISTRICT COURT OF TOM GREEN COUNTY, 51ST JUDICIAL DISTRICT



NO. CV87-0593-A, HONORABLE JOHN E. SUTTON, JUDGE 



 




 Earl White sued Egghead Enterprises, Inc. (a corporation organized and formerly
existing under the laws of the State of Texas), Ronald Craig McGuire, and First City National
Bank of San Angelo (in the bank's capacity as trustee of the Ronald Craig McGuire Trust),
praying for a declaratory judgment that Earl owned eighteen percent of the outstanding shares of
stock in Egghead. (1) Following a bench trial, the court below rendered judgment that Earl and his
wife, Linda White, owned jointly 5.37% of the outstanding shares. Earl appeals. We will affirm
the judgment.


THE CONTROVERSY


 On May 20, 1982, Craig and his father, Troy McGuire, obtained from the
Secretary of State the articles of incorporation for Egghead Enterprises, Inc., a close corporation. 
The articles provided that Egghead would be managed by the shareholders rather than the
directors. On June 15, 1982, Troy, Craig, and Craig's sister held the organizational meeting,
elected themselves directors and officers of the corporation, and adopted bylaws. (2) While the
minutes do not reflect any act by anyone that authorized the issuance of shares, a share certificate
was issued to Craig or perhaps to Troy evidencing ownership of 5,000 shares of Egghead capital
stock. (3)

 At about the same time, Craig and Troy sought from Earl White, Troy's brother-in-law, advice about investing funds Craig had received on a personal-injury recovery. As a result,
Earl found in Dallas County a seven-acre tract of land that Egghead subsequently purchased. The
record does not reveal how the corporation acquired the money necessary to make the purchase. 
Craig may have lent the money or the corporation may have obtained it by Craig's payment for
the 5000 shares mentioned above. 

 Thereafter, the following transactions occurred in connection with the capital stock
of the corporation:

 Affirmation of Craig's 5000 shares. In late June 1982, Troy, Craig, and Earl met
with Charles Carruth, a Dallas attorney recommended by Earl. They wished to make sure that
Egghead's organizational meeting was properly "documented." Troy and Craig told Carruth that
the corporation had previously issued 5000 shares to Craig or Troy. They could not find the share
certificate, they told Carruth, but the corporation actually "belonged" to Craig because his money
capitalized Egghead. Carruth prepared a new set of bylaws and other documents, including the
minutes of an organizational meeting. (4) The new minutes declared that Craig was the sole director,
officer, and shareholder, and that he had authorized the corporation to issue to himself 5000
shares of stock in consideration of one dollar per share. While the minutes formally authorized
for the first time the issuance of any shares of capital stock and their sale to Craig, the latter
transaction was not evidenced by a share certificate, apparently on the theory that the previously
issued certificate was sufficient. In August or September 1982, however, Carruth wrote
"certificate void" on the blank stock-register stub that corresponded to the missing stock certificate
evidencing Craig's 5000 shares. This action may have been taken at Craig's direction. The
record does not indicate any underlying basis for the action, such as Craig's transfer of the 5000
shares to someone else or the corporation's acquisition of his 5000 shares.

 Acquisition of 970 shares by the Ronald Craig McGuire Trust. In late 1982 or
early 1983, Craig created for his benefit (with Carruth's assistance) the "Ronald Craig McGuire
Trust." The trust instrument assigned to the co-trustees, Carruth and the North Dallas Bank &
Trust, "discretion and complete power to administer" the trust as well as "all powers conferred
on trustees by the Texas Trust Act." On August 25, 1983, the co-trustees received from the
corporation a certificate for 970 shares. The record does not reveal the character of these 970
shares as being: (1) shares newly issued by the corporation in addition to the 5000 shares issued
earlier to Craig; or (2) shares included within the 5000 shares issued to Craig, which he then
transferred to the trust, the certificate being issued to reflect the trust's new ownership of the
shares. Because the record is silent regarding any corporate act suggesting the issuance of any
new shares, in addition to the 5000 shares, one must conclude that the second proposition is the
only logical one.

 Acquisition of 270 shares by Earl and Linda White. In the same meeting in late
1982 or early 1983, Craig and Carruth decided to create a compensation scheme for Earl, who
had been managing Egghead's business and supervising the construction of buildings on the seven-acre tract. Earl's pay for the work had been meager because Egghead lacked the cash to pay him
more. On August 25, 1983, Earl and Egghead entered into a written contract under which Earl
would receive a quantity of the corporation's stock, equal in value to $18,000, as payment for
work he had previously done. The contract also provided that Earl would receive for his future
work an annual salary of $25,000 and fifteen percent of the corporation's profits. On August 25,
1983, Craig, the sole director of Egghead, held a special meeting of the board of directors. The
minutes of the meeting declare a resolution "that the corporation issue 30 shares of EGGHEAD
ENTERPRISES, INC. to Earl White, who has been an employee of the corporation since
January." This is the only instance in which the directors formally authorized the issuance of any
capital stock, in addition to the 5000 shares authorized to be issued and sold to Craig in the
beginning.

 In October 1983, the corporation purportedly issued to Earl and Linda a certificate
for 225 shares, and in August 1984 the corporation purportedly issued to them a certificate for
an additional fifteen shares. (5) The record contains no showing, however, that the board of
directors authorized the issuance of any new shares in addition to the 5030 previously issued from
the 100,000 total shares authorized by the articles of incorporation. Moreover, neither Craig nor
either of the trustees signed the stock certificates.



THE TRIAL-COURT PROCEEDINGS


 In 1986, the corporation dissolved and all its assets were sold. In 1987, Earl sued
Egghead, Craig, and the trust. Earl alleged three causes of action. He sued on his contract and
in quantum meruit to recover sums due him for his work in behalf of the corporation. He joined
to these a cause of action to obtain a declaratory judgment that he owned eighteen percent of the
outstanding shares of Egghead capital stock. Only the declaratory judgment action is before us
on appeal. Earl did not sue for an accounting of any kind or for the value of the shares he
believed he owned; he did not assail the bona fides of Egghead's corporate existence or allege that
it was the alter ego of Craig; he did not attack the creation of the trust or its terms.

 The trial court determined after trial that Earl and Linda jointly owned 270 shares,
or 5.37% of the total of 5030 shares that the corporation had issued from the 100,000 shares
authorized by its articles of incorporation. The trial-court findings of fact and conclusions of law
indicate the trial court's reasoning:

 1. By formal resolution of the board of directors, Egghead authorized the issuance
of 5030 shares, being the total of the 5000 shares authorized in June 1982 for sale to Craig and
the thirty shares authorized August 25, 1983 for delivery to Earl in consideration of services
previously performed by him.

 2. All 5030 shares were outstanding at the time of trial because none had ever been
canceled for any reason. At the time of trial the 5030 shares were owned as follows:

 3. Craig owned 3790 shares, being the remainder of his 5000 shares after
deducting his transfer of 970 shares to the trust and his transfer of 240 shares to Earl and Linda
as a gift, as evidenced by the share certificates issued August 25, 1983.

 4. Earl and Linda owned 270 shares, being the total of the thirty shares authorized
by the board of directors on August 25, 1983 and the 240 shares they acquired by gift and transfer
from Craig, as evidenced by the share certificates issued in October 1983 (225 shares) and August
1984 (fifteen shares).

 The trial court rendered judgment accordingly. Earl appeals on two points of error.



POINTS OF ERROR


 In his first point of error, Earl assails the foundation of the trial court's reasoning --
that 5030 shares were outstanding at the time of trial. He contends he proved as a matter of law
that there were 1000 shares outstanding on August 25, 1983. He points first to the fact that the
phrase "certificate void" was marked on the stub opposite the certificate for Craig's 5000 shares,
arguing that these shares were not "canceled" but simply reacquired by the corporation as treasury
stock. (6) Earl contends that from August 1982, when Carruth wrote "certificate void" on the
certificate stub, there were no shares outstanding until August 25, 1983, when the parties' actions
resulted in the issuance of 1000 newly issued and outstanding shares. This is the total of the 970
shares transferred to the trust on August 25, 1983, as evidenced by a share certificate of that date,
together with the thirty shares that the board of directors authorized for issuance to Earl on the
same date. By these transactions, Earl concludes, he acquired on August 25, 1983, three percent
of the 1000 shares that were outstanding. We note that under this theory Craig was no longer a
shareholder after August 25, 1983, although the trust owned and held 970 shares for his benefit.

 In his second point of error, Earl contends he proved as a matter of law, or by the
great weight and preponderance of the evidence, the following transactions that resulted in his
owning eighteen percent of the outstanding shares at the time of trial:

 1. After August 25, 1983, the board of directors authorized the issuance of 500
new shares in addition to the 1000 shares mentioned above.

 2. Earl acquired 240 of these shares by issuance of the share certificates issued in
October 1983 (225 shares) and August 1984 (fifteen shares).

 3. The trust acquired 260 of the newly issued shares at some unspecified time after
August 25, 1983, even though that proposition was not evidenced by any resolution of the board
of directors or by any share certificate.

 4. As a result, there were outstanding at the time of trial only 1500 shares, of
which Earl owned eighteen percent or 270 shares (thirty acquired before August 25, 1983, and
240 shares acquired thereafter).



DISCUSSION AND HOLDINGS


 We have examined carefully Earl's argument in light of all the evidence. Much
of the argument equates the issuance of a share certificate with the issuance of new shares from
among the 100,000 shares authorized by the articles of incorporation. The issuance of a share
certificate may also evidence, however, a recording on the corporate books of the transfer of
shares previously issued and then outstanding. For purposes of discussion, however, we will
accept Earl's assumption that the certificates involved in the present case all represented newly
issued shares. Much of Earl's argument also equates an intention to act with the act itself. We
will also accept for purposes of discussion this very doubtful assumption. Finally, Earl's entire
theory on appeal depends upon the legal rule that the acts of a sole shareholder may be tantamount
to the acts of the corporation itself. See Sutton v. Reagan & Gee, 405 S.W.2d 828, 836 (Tex.
Civ. App. 1966, writ ref'd n.r.e.); see also Caldwell v. Kingsbery, 451 S.W.2d 247, 251 (Tex.
Civ. App. 1970, writ ref'd n.r.e.) ("Where directors are the stockholders, they are the corporation
itself."). (7) We may take that rule only as far as its terms allow, however, and it cannot extend in
the present case so far as Earl would take it.

 Earl's claim to own eighteen percent of 1500 outstanding shares requires a
determination that the corporation acquired as treasury shares the 5000 shares issued previously
to Craig, and a determination that the corporation thereafter issued 1500 new shares: 970 shares
issued to the trust; 270 shares issued to Earl; and 260 shares issued to Craig. (8) These actions, so
far as the evidence indicates, may have been inferred only from Craig's "intentions" in various
particulars under the rule that imputes to a corporation the informal actions of its sole shareholder. 
Nevertheless, under Earl's own theory of the evidence, Craig was no longer a shareholder at all
after the corporation acquired as treasury stock the 5000 shares previously issued to Craig; under
Earl's theory, only the trust and Earl owned shares in Egghead. Thereafter, there could be no
application of the rule that would permit one to impute to Egghead any of Craig's informal actions
as a shareholder. Craig remained the only director, of course, but he might act in that capacity
only by formal resolution to the effect that the corporation: (1) acquired as treasury stock the
5000 shares previously issued to Craig; (2) issued 970 shares to the trust; (3) issued 240 shares
to Earl; and (4) issued 260 shares to Craig in consideration of something of value. There is no
evidence of any such resolutions by the board. Consequently, any issuance of 240 new shares to
Earl would be a nullity because Craig, as an individual, had no power to approve the issuance,
and as a director he could act only by a formal resolution which the evidence did not show. This
accounts for the trial court's theory that Craig transferred the 240 shares as a gift to Earl, the
certificate issued to Earl being only evidence of Craig's gift from among his 5000 shares.

 The foregoing is not changed by the fact that Craig was the beneficiary of the trust. 
Under the terms of the trust, only the trustee, the North Dallas Bank & Trust, and the co-trustee,
Charles Carruth, had the power to act on behalf of the trust, (9) and, of course, Craig had no power
to issue an additional 240 shares to Earl merely by virtue of his position as beneficiary of the
trust. (10) 

 The trial court determined that Earl and Linda owned jointly 5.37% of the
outstanding 5030 shares. If carried to the scope permitted by its terms, Earl's theory, based solely
upon the rule which imputes to a corporation the acts of its sole shareholder, would result in Earl
and Linda owning only thirty of 1000 outstanding shares, or three percent of those shares -- a
quantity less than that awarded by the trial court. Therefore, we need not consider whether the
trial court erred in any particular urged by Earl. It is apparent that any such error was harmless
and cannot require a reversal of the judgment below. Tex. R. App. P. Ann. 81(b) (Pamph. 1992). 
We hold accordingly. We overrule both points of error and affirm the judgment.


 

 John Powers, Justice

[Before Justices Powers, Jones and B. A. Smith]

Affirmed

Filed: February 26, 1992

[Do Not Publish] 
1. Egghead Enterprises, Inc. is now dissolved. White sued, however, within three years of
the dissolution, a period during which the corporation continued its corporate existence for the
purpose of defending or prosecuting actions on claims existing, or any liability incurred, before
dissolution. See Tex. Rev. Civ. Stat. Ann. art. 1302-2.07 (1980) (since repealed by 1987 Tex.
Gen. Laws, ch. 93, § 48(b), at 230).
2. Although the articles of incorporation stated that Egghead was a close corporation and
allowed it to be managed by shareholders rather than by a board of directors, the parties
invariably treated the corporation as a director-managed corporation. Moreover, they did not
prepare a shareholder agreement to provide for shareholder management. See Tex. Bus. Corp.
Act Ann. art. 12.34 cmt (Supp. 1992) (stating that inclusion of a statement in the articles of
incorporation that a corporation is a close corporation does not authorize the corporation to
operate as a close corporation, but only authorizes the shareholders to enter into an agreement
providing for shareholders' management). We will analyze the issues as though this was an
ordinary corporation, and not a close corporation, although this distinction actually has no bearing
on the result reached by our analysis.
3. The fledgling corporation did not have the benefit of legal advice in preparing these
documents. Craig or Troy obtained a form book for corporations, and proceeded according to
the directions and forms in that book.
4. The documents prepared by Carruth are dated May 20, 1982. Apparently Carruth or one
of the parties backdated these documents because May 20 precedes the June 15 date reflected on
the minutes and bylaws taken from the form book. There would have been no need to sign the
form documents had Carruth already prepared other documents.
5. It is not clear whether the parties considered these shares to be compensation for Earl's
work on Egghead's behalf, or whether they were gifts from Craig to Earl and Linda. Craig, who
was partially paralyzed, lived with Earl and Linda and depended on them for transportation, care,
and companionship. In his testimony, Earl referred to the shares as a gift, although he also
implied by his testimony that he considered the shares compensation for services he and Linda had
performed for Craig.
6. Carruth testified that he "canceled" the shares by marking "certificate void" on the stock
register stub. Earl apparently concedes, however, that the corporation did not redeem and cancel
the shares according to the procedures set out in the relevant statutes. See Tex. Bus. Corp. Act
Ann. arts. 4.08, 4.10 and 4.11 (1980 & Supp. 1992) (outlining steps for redemption and
cancellation of shares). Earl argues instead that Carruth and others used the term "cancellation"
loosely to mean some character of reacquisition of the shares by the corporation, which created
5000 treasury shares and left no shares owned by anyone except the corporation itself.
7. Many other courts and commentators subscribe to this rule as well. See, e.g., Myhre v.
Myhre, 544 P.2d 276, 282 (Mont. 1976) (when directors of a corporation are its only
shareholders, they may act for the corporation without formal meetings); see also 18B Am.Jur.2d
Corporations § 1449 (1985) ("Action taken by directors who are sole shareholders without a
formal meeting is corporate action, and any corporate obligation so created is binding on the
corporation."); 2 William M. Fletcher, Fletcher Cyclopedia of the Law of Private Corporations
§§ 394, 394.1, 395, at 271-76 (Charles R. P. Keating, Charity R. Miller, and Timothy P. Bjur
eds., rev. ed. 1990). 
8. We doubt whether this sequence of events posited by Earl could legally occur. The
corporation's acquisition of the 5000 shares, without compensation paid to Craig, means that he
must have made a gift to Egghead of his shares, and thereafter owned none of the corporation. 
From August 1982 to August 1983, then, the corporation would have owned itself, because all
of its shares would have been treasury shares. We question the legality of this result.


 Moreover, a year later the corporation would had to have made a gift of 970 shares to the
trust, because the trust gave no consideration for the shares. This would not be valid. See Tex.
Bus. Corp. Act Ann. art. 2.16 (1980) (since amended by 1983 Tex. Gen. Laws, ch. 540, § 4, at
3150). In fact, under this theory, Earl would own all of the Egghead shares, since only he
provided consideration in the form of labor performed for his thirty shares. We cannot conclude
Craig intended this result.
9. Even though Carruth was a co-trustee and was involved in the events Earl complains of,
there is no evidence, and no party has suggested, that Carruth was acting in his capacity as a
trustee when he assisted Craig in these purported transactions. Even if Carruth was acting in his
capacity as trustee, he could not transfer the corporation's assets to Earl without the knowledge
and acquiescence of North Dallas Bank & Trust. See Brown v. Donald, 216 S.W.2d 679, 683
(Tex. Civ. App. 1949, no writ) (stating that when the trust instrument names more than one
trustee, the trustees must act jointly unless express authority is given to the contrary because
action taken by a trustee separately is not binding on the trust).
10. The trust instrument signed by Craig stated, "I grant to all my fiduciaries discretion and
complete power to administer my estate and I grant to all my fiduciaries all powers conferred on
trustees by the Texas Trust Act on fiduciaries." At the time Craig executed the trust instrument,
the Texas Trust Act gave trustees with legal title to securities the power, "except as limited by the
. . . trust instrument, [to] have and exercise all powers of an absolute owner in respect of such
securities." Tex. Rev. Civ. Stat. Ann. art. 7425b-25(F) (1960) (since repealed and codified as
amended at Tex. Prop. Code Ann. § 113.016 (1984)). The trust instrument imposed no
restrictions on the trustees' power to administer the securities.