**SUPER VALU STORES, INC.**

v.

**FIRST NATIONAL BANK OF COLUMBUS, GEORGIA, as Executor and Trustee under the Will of Owen G. Roberts, Jr., Deceased, Defendant and Third-Party Plaintiff,**

v.

**Robert G. MUNCY, Third-Party Defendant.**

Civ. A. No. 76–38–Col.

United States District Court,
M. D. Georgia,
Columbus Division.

Jan. 17, 1979.

Joseph L. Waldrep, Waldrep & Williams, P. C., Columbus, Ga., Charles S. Doster, Merrill, Porch, Doster & Dillon, Anniston, Ala., for plaintiff.

Gary L. Coulter, Albert W. Stubbs, Hatcher, Stubbs, Land, Hollis & Rothschild, Columbus, Ga., for defendant and third-party plaintiff.

Robert G. Muncy, pro se.

OWENS, District Judge:

Plaintiff Super Valu Stores, Inc., a Delaware corporation with its principal place of business in Minnesota, filed its complaint on April 6, 1976, against the First National Bank of Columbus, Georgia, as Executor of the Last Will and Testament of Owen G. Roberts, Jr. who died June 23, 1974, alleging that plaintiff's predecessor Chastain-Roberts Company, Inc., a Minnesota wholesale grocery corporation with its principal place of business in Anniston, Alabama, sold groceries to a Georgia convenience store, supermarket operator corporation, Consolidated Customer Services, Inc., of which the deceased Mr. Roberts was a 50 percent stockholder, director, officer and general counsel; and as a result of Mr. Roberts'

conduct for which his estate is monetarily liable, has still not been paid some $449,-000.00, plus interest and expenses. More specifically the plaintiff's complaint alleges in Count I that the deceased orally agreed to pay $50,000.00 for 1,000 shares of Consolidated's common stock, that the stock was issued on January 11, 1971, and that the $50,000.00 is still owed; in Count II that a $100,000.00 life insurance policy on the deceased was purchased, paid for by and intended to be payable to Consolidated but was wrongfully paid to the estate; in Count III that a series of checks given plaintiff's predecessor Chastain-Roberts, which checks the deceased knew or should have known were drawn on insufficient funds, were returned by Consolidated's bank on account of stop payment instructions or being drawn on insufficient funds and thus constituted fraudulent misrepresentations damaging plaintiff's predecessor at least $300,000.00; and in Count IV that the deceased neglected and failed to perform his duties as a director, the treasurer of and attorney for Consolidated thereby breaching his fiduciary duties to plaintiff's predecessor as a creditor of Consolidated and causing damages of at least $449,000 plus interest and expenses to plaintiff's predecessor.

Defendant executor filed responsive pleadings asserting many defenses which will be considered and discussed and denying any and all liability. Discovery has been completed, a motion for summary judgment has been filed by the defendant and this constitutes the court's decision as to defendant's motion. In considering defendant's motion and plaintiff's responses thereto the court has evaluated plaintiff's responses in accordance with *Lovable Company v. Honeywell, Inc.*, 431 F.2d 668 at 670 (5th Cir. 1970):

█ By the very nature of the motion, the granting of a motion for summary judgment is the exception rather than the rule. However, it is a tool made available to the courts for their proper use when nothing is to be gained by a full trial.

■ As stated by this court in *Liberty Leasing Co. v. Hillsum Sales Corp.*, 5 Cir., 1967, 380 F.2d 1013, "The burden is upon the moving party . . . to establish that there is no genuine issue of fact, *Kilfoyle v. Wright*, 5 Cir., 1962, 300 F.2d 626, 629; *Bragen v. Hudson County News Co.*, 3 Cir., 1960, 278 F.2d 615, 617, and the party opposing the motion should be given the benefit of every reasonable doubt, *Heyward v. Public Housing Administration*, 5 Cir., 1956, 238 F.2d 689, 696. However, rule 56 requires that the opposing party be diligent in countering a motion for summary judgment, *Southern Rambler Sales, Inc. v. American Motors Corp.*, 5 Cir., 1967, 375 F.2d 932, and *mere general allegations which do not reveal detailed and precise facts will not prevent the award of summary judgment*, Federal R. of Civ. P. 56(e), *Robin Construction v. United States*, 3 Cir., 1965, 345 F.2d 610, 613–614." 380 F.2d 1013, 1014–1015.

(emphasis added).

Viewed in this light it is this court's considered judgment that the pleadings, depositions, answers to interrogatories, admissions on file, affidavits and exhibits show that there is no genuine issue as to any material fact and that the defendant executor is entitled to a judgment as a matter of law. The undisputed facts as thus shown and the reasons for the court's opinion that the defendant executor is entitled to a judgment as a matter of law, are hereinafter stated.

The plaintiff having conceded at pretrial on November 1, 1977, that contrary to its belief when its complaint was filed, defendant executor was the lawfully designated beneficiary of a group life insurance policy on the deceased the terms of which permitted the insured individual and not Consolidated to make such a designation, it is unnecessary to discuss either the facts or the law as to that claim. Plaintiff's concession entitles defendant to a judgment on that claim.

Robert G. Muncy came to Columbus, Georgia, for Officers Candidate School at Fort Benning. While there he retired from the Army because of medical disability and went to work for Southland Corporation, a Columbus corporation operating 7–11-type stores. In January 1970 Mr. Muncy left Southland and went into business for himself operating two 7–11-type stores—one located at Fortson that he had purchased in 1967 and another that he bought around the time he left Southland's employment. In June or July, Mr. Muncy sold his most recently acquired store to Gold Platter Services, Inc. of Macon, Georgia, and became employed as a Vice-President of Gold Platter.

Penny Wise, Incorporated, a Columbus, Georgia, corporation operating 7–11-type stores filed a bankruptcy reorganization proceeding in the Columbus Division of this court[1] on September 25, 1970. Owen Roberts, Jr., the deceased, practiced law in Columbus and was a partner of the law firm that represented Penny Wise. Robert G. Muncy first met Owen Roberts when he negotiated in behalf of Gold Platter with Mr. Roberts as Penny Wise's attorney as to the possibility of taking over Penny Wise's stores. Following many discussions Muncy and Roberts agreed to bid in Muncy's name on all the Penny Wise stores at an auction to be held by the Phenix Girard Bank as Trustee. The successful bid was made by them in the amount of $49,909.66 in the name of Robert G. Muncy and Associates, and the operation of the stores was taken over as of December 17, 1970. Muncy and Roberts paid a cash binder to the trustee with funds borrowed from the First National Bank of Columbus; Muncy thinks it was five or ten thousand dollars but is not sure.

Muncy resigned from Gold Platter Services, Inc. around the time the operation of the Penny Wise stores began and received from Gold Platter some $15,000 for Gold Platter stock he owned.

Owen Roberts as an attorney petitioned the Superior Court of Muscogee County for

1. Bankruptcy file No. 10648. That file has been examined and judicial notice taken of the dates and terms of sale of the Penny Wise stores.

a corporate charter in the name of Consolidated Customer Services, Inc., and the charter was granted on January 11, 1971. The articles of incorporation provide for the issuance of up to 25,000 shares of common stock at a par value of $1.00 per share and further provide that the corporation shall not commence business prior to having received at least $10,000 capital. On January 20, 1971, stock certificate number 1 for 1,000 shares was issued to Roberts and number 2 for 1,000 shares was issued to Muncy; both were signed by Muncy as President and Roberts as Secretary-Treasurer. Georgia law requires at least three directors of the corporation; they were Roberts, Muncy and Jean B. Killingsworth, Roberts' secretary. Ms. Killingsworth was also Assistant-Secretary of the corporation.

There was no written agreement as to the consideration that was paid by Roberts and Muncy for their respective 1,000 shares. The corporate minutes and records which are almost non-existent do not indicate what was paid upon issuance and do not indicate that any consideration was to be paid at a later date. The only writings are various un-audited, unsigned financial statements of the corporation showing the 2,000 shares to have been issued for $10,000; those financial statements do not show unpaid stock subscriptions or any other amounts owed by either Muncy or Roberts to the corporation.

Muncy testified that he and Roberts had discussions around the time of buying the Penny Wise stores and getting started as to the monetary amount they would each contribute to the corporation. (Muncy deposition, p. 23). Muncy, asked how much he paid the corporation for his 1,000 shares, stated "I put into the corporation a business in Fortson, Georgia, and a laundromat on Forrest Road and *right at* $15,000." (emphasis added). (Muncy deposition, p. 20). Mr. Muncy further testified:

Q And what was your business in Fortson, Georgia and your laundromat worth?

A Some $50,000.

Q And did you talk to Mr. Roberts about putting that business in?

A Yes, we did.

Q And did you all agree that it was worth $50,000?

A Well, the value was $50,000 and we discussed it. I mean it wasn't where he said, "I don't think it is worth that," or that it was worth more. It was a figure we just put on it.

Q And he didn't object to the fact that you said it was worth $50,000?

A No.

Q Was any paperwork done on that transfer to your knowledge?

A There may have been some done at a later time, but I don't remember. There may have even been some done near the time of the transaction. I just don't remember.

Q What was the name of that store?

A The name of that store was Speedy Shop; Speedy Shop Number 1.

Q And where was that?

A On Cartledge.

Q And where was the laundromat located?

A On Forrest Road.

Q And the store on Forrest Road consisted of inventory and equipment?

A The one on Fortson Road had inventory and equipment, yes.

Q And what was in the laundromat?

A Numerous washers, dryers, hot water heaters; everything that it takes to operate that particular business.

Q And up to that time, you personally owned both of those businesses?

A Yes, I did.

Q You stated that Mr. Roberts was issued 1,000 shares of stock?

A Yes, sir.

Q And that you all were to be 50–50 owners in this business?

A Initially, yes.

Q And what did he put in the corporation for his stock?

A Nothing.

Q Did he put any cash into the corporation to your knowledge?

A No, sir.

Q Did he put any property into the corporation to your knowledge at that time?

A At the time of the formation of the corporation?

Q Yes, sir.

A No, sir.

Q Did he agree that he would put in an amount equal to the amount that you put in?

A Yes, sir.

Q Did you all discuss this?

A We said that I would put in the stores and he would put in equal amounts.

Q And was it you all's agreement then that you would put in cash and the stores and he would match what you put in?

A That was the agreement.

Q Did you sign any written documents to that effect?

A Not that I remember.

Q Do you recall when all of this discussion took place?

A Around the time of the buying of the stores and getting started.

Q And where would most of these discussions take place?

A Well, a lot of the discussions were probably en route to and from Macon, Georgia; and some of them would have been, you know, at his office. And we drove around and looked at the stores all over town.

Q Where did you get the $15,000 cash you indicated that you put into the business?

A The money that was owed to me by Gold Platter Services.

Q Was that on the sale of the stock that you previously sold to him?

A Right. I had gotten some stock in the transaction and the deal was if I ever left the company I would get money for that stock.

Q And they paid you for that?

A Right.

Deposition of Robert G. Muncy, pp. 20–23.

There is no written record of any agreement, no minutes or memorandum and no indication from any financial records or statements that anything—money or property—greater in value than the total of $10,000 already mentioned, was contributed to the corporation. Plaintiff has produced no bank record of Mr. Muncy or Consolidated to prove when or how much Muncy actually paid in money for his issued stock. Mr. Muncy throughout his deposition equivocated by using such terms as "right at". Mr. Muncy never said he paid a definite amount of money into the corporation within a certain period of time.

The bankruptcy records of this court show that Robert G. Muncy on April 2, 1971, notified the court of the incorporation of Consolidated and requested that the purchase agreement or bill of sale from the trustee be made to Consolidated instead of Robert G. Muncy & Associates. By court order dated April 14, 1971, the trustee was authorized upon payment of $49,909.66 to convey the Penny Wise stores and corporate assets to Consolidated subject to all accounts payable which accrued after December 17, 1970. The trustee by report and order of discharge dated January 21, 1972, showed its compliance with said court order on April 14, 1971. According to James W. Key, President of the First National Bank, Consolidated on April 19, 1971, borrowed $38,000 to complete the purchase of the Penny Wise stores; that loan was endorsed by Roberts and Muncy (deposition of Mr. Key, pp. 12–16). The court thereby concludes that the Penny Wise stores and assets were conveyed to and paid for by Consolidated by April 19, 1971.

Muncy further testified that while he and Roberts had their discussions before the corporation was formed and the stock issued, the actual transfer of Muncy's store and laundromat took place April 1, 1971. (Muncy deposition, p. 27).

No one other than Robert G. Muncy is a witness as to the circumstances surrounding

the issuance of Consolidated's stock to Muncy and Roberts.

Robert G. Muncy had the complete responsibility for the day to day operations of Consolidated. Owen Roberts did not participate in Consolidated's daily operations but did materially assist those operations by personally endorsing Consolidated's promissory notes to the First National Bank, signing personal guaranty agreements and pledging a $100,000 certificate of deposit that belonged exclusively to him, as collateral for his endorsements and guaranty of the corporation's debts to the bank. While Muncy also endorsed the corporation's notes to the bank, the bank extended credit because of Roberts' personal net worth[2] and not because of Muncy's. The bank also had life insurance on Roberts.

Consolidated initially operated six stores but very rapidly acquired more and opened one new store of its own. By the end of 1971 it was operating some thirteen stores. (Deposition of Mr. Muncy, p. 41) In 1972 the corporation continued to expand by buying two supermarkets and two other such stores that Kroger had operated. In addition Consolidated got into the liquor store business and other ventures that do not need to be detailed.

Consolidated started buying groceries from Chastain-Roberts around the end of 1972. At the outset Chastain-Roberts served only one super market size store on 13th Avenue and soon the Traffic Circle Supermarket size store was added. Sales were on credit and the total owed to Consolidated was permitted to steadily increase. An overall picture is shown by the following schedule of accounts and notes receivable representing amounts owed by Consolidated submitted by plaintiff:

SCHEDULE 1

CHASTAIN–ROBERTS CO. INC.
ACCOUNTS / NOTES RECEIVABLE
CONSOLIDATED CUSTOMER SERVICE, INC.
(MUNCY STORES)

| STORE NO. | LOCATION | 2–23–73 | 6–14–73 | Balance 9–07–73 | 12–15–73 (Adjusted) | 2–23–74 | 3–22–74 | 5–17–74 | 9–07–74 |
|---|---|---|---|---|---|---|---|---|---|
| **SUPER MARKETS:** | | | | | | | | | |
| 85 | Traffic Circle S.V. | $50,293 | $ 41,636 | $ 52,749 | $ 27,995 | $ 53,438 | $ 49,526 | $ 65,697 | $ — |
| 304 | Five Points S.V. | 24,008 | 47,709 | 82,617 | 18,010 | 30,982 | 26,725 | 40,491 | — |
| 91 | Midtown Plaza S.V. | — | 46,545 | 56,666 | 36,404 | 57,732 | 57,990 | 78,172 | — |
| 228 | Expressway S.V. | — | 50,198 | 56,778 | 31,579 | 66,564 | 47,620 | 63,851 | — |
| (1) 2004 | Phenix City | — | — | — | — | 259 | — | — | — |
| **MINI MARKETS:** | | | | | | | | | |
| 214 | Super Saver-1200 Brookhaven | $ — | $ 7,962 | $ 8,963 | $ 4,785 | $ 7,994 | $ 7,847 | $ 8,974 | — |
| 2000 | Penny Saver # 1 | — | — | — | 4,414 | 7,223 | 6,540 | 6,524 | — |
| 2007 | Super Saver-Baker Village | — | — | — | — | — | 12,711 | 13,202 | — |
| (1) 2008 | Super Saver-Fort Mitchell | — | — | — | — | — | — | — | — |
| * 2010 | Office Adm. Consolidated Office | — | — | — | 196,953 | — | 106,268 | 38,820 | — |
| | | $74,302 | $194,053 | $257,775 | $320,044 | $224,196 | $315,250 | $312,733 | — |

2. Owen Roberts' net worth according to President Key was:

| | | | |
|---|---|---|---|
| 6/26/68 | $214,120 | 7/15/71 | $676,290 |
| 1/27/70 | 314,500 | 1/16/73 | 823,790 |

(Deposition of Mr. Key, p. 20).

TOTAL ACCOUNTS RECEIVABLE
NOTES RECEIVABLE

| | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| Original Amounts $200,000 | — | — | — | $200,000 | — | — | — | — |
| $100,000 | | | 94,000 | 78,000 | 74,299 | 74,299 | 58,299 | — |
| $395,000 | | | | | 314,890 | 304,890 | 304,890 | — |
| $699,000 | | | | | | | | 699,000 |
| $ 80,000 | | | | | | | | 80,000 |
| TOTAL NOTES RECEIVABLE | — | — | $ 94,000 | $278,000 | $389,190 | $363,190 | $363,190 | 779,000 |
| TOTAL ALL RECEIVABLES | | | | | | | | |
| | $74,302 | $194,053 | $351,775 | $598,044 | $613,386 | $694,440 | $675,924 | 779,000 |

\* Accounts used for processing N.S.F. Checks.

(1) Stores # 2004 and 2008 were put on bank deposit procedure when we started shipping No Receivable Exposure.

---

Chastain-Roberts in selling to Consolidated, extending credit to Consolidated, taking the promissory notes shown on plaintiff's schedule, getting financial and credit information from Consolidated and doing everything else that was done, dealt only with Robert Muncy. From the outset Chastain-Roberts knew that Owen Roberts was a director and an officer of Consolidated. There is nothing to indicate that any employee of Chastain-Roberts ever even talked to Owen Roberts or that Chastain-Roberts ever wrote to Owen Roberts as attorney for or Secretary-Treasurer of Consolidated about anything. Owen Roberts, neither individually nor as Secretary-Treasurer, even signed any of the $395,000 of various promissory notes shown on plaintiff's schedule.

In April 1973 Owen Roberts went into the hospital and learned that he had cancer. Roberts' condition was known to Muncy and those who worked with him.

By June of 1973 Chastain-Roberts was supplying two additional super markets and a mini market of Consolidated's, and as shown by plaintiff's schedule the total owed by Consolidated to Chastain-Roberts as of June 14 was $194,053.00.

In September 1973 Chastain-Roberts put Consolidated on a "Blank Check" policy. Ted Thiel of Chastain-Roberts in a memo entitled "Accounts Receivable Objective" around October 6, 1973, explained that Chastain-Roberts was then owed $2,573,723

accounts receivable by all its customers and that as aged they were owed:

| 1–7 days | 53.2% |
| 7–14 days | 30.3% |
| 15–21 days | 8.6% |
| 22–28 days | 3.9% |
| 29 and over | 4.0% |

In his memo he further stated "For the long range program we believe the approach should be 'Blank Check' *for all retailers* with the objective of holding *all receivables* in the 1 to 7 day category. Those retailers that cannot clear their account to one week would be financed with a secured note—inventory or equipment—at a low interest rate but only financed if the retailer will go on the 'Blank Check' procedure." Exhibit B–1.

After being put on a "Blank Check" policy Consolidated was required to furnish its checks already signed by Muncy and made payable to Chastain-Roberts but otherwise blank, to Chastain-Roberts. At the end of each week Chastain-Roberts would total its sales to Consolidated for that week; insert the date, its name as payee and the dollar amount; deposit Consolidated's check in its bank account; and then telephone to advise Consolidated of the amount the check was negotiated for.

Copies of checks furnished by plaintiff show that Chastain-Roberts deposited and soon learned that payment had been stopped on two Consolidated blank checks dated by them September 27, 1973, for $16,-

029.94 and $37,720.10—totaling $53,850.04. In spite of the fact that those checks remained uncollected Chastain-Roberts—then owed by Consolidated at least $351,775 (as of 9/7/73) plus this $53,850.04—continued delivering groceries to Consolidated. On October 8 payment was stopped on an additional $124,015.73 check. Chastain-Roberts nevertheless continued selling groceries switching to a requirement that Consolidated pay $50,000 plus each week's deliveries, all in addition to its note payments. By November 2, 1973, Consolidated in addition to large promissory notes owed Chastain-Roberts $318,391.52 of which $208,517.71 was owed more than 15 days. In the face of this mounting debt and unpaid checks Chastain-Roberts continued to sell to Consolidated and soon more stop payment checks dated and in the following amounts resulted.

| No. 4260 | November 1, 1973 | $ 50,000.00 |
| 4261 | November 8, 1973 | 108,222.00 |
| 4568 | November 21, 1973 | 66,713.98 |
| 4567 | November 21, 1973 | 50,000.00 |
| 4569 | November 30, 1973 | 146,953.47 |

By December 15, 1973, Consolidated owed $320,044.00 accounts receivable and $278,000.00 notes to Chastain-Roberts. $196,953.00 of the accounts receivable *according to Plaintiff's Schedule # 1* was for stop payment checks. This schedule does not agree with plaintiff's continued assertion to the court by its failure to supplement its interrogatory answers that it has never been paid for these checks which total $599,655.32.

Chastain-Roberts on December 13, according to Ted Thiel's memo, again analyzed this account. According to that memo the account receivable balance as of December 7 was $460,250.64 and of that $335,164.85 was owed more than fifteen (15) days. Looking at *accounts receivable alone* this shows a 35 day change of:

| | Total | Over 15 days |
| --- | --- | --- |
| November 2, 1974 | $318,391.52 | $208,517.71 |
| December 7, 1973 | 460,250.64 | 335,164.85 |
| Increase | $141,859.12 | $126,647.14 |

almost all of which is in the over fifteen (15) days category.

According to that same memo, "On December 3 we put retailer on certified or cashier checks *or no merchandise* and we are following that procedure now." (emphasis added). Also specific discussions were had with Robert Muncy on December 11 about this entire account and how it would be paid—"weekly payment of ten to fifteen thousand dollars." Even with some $600,000 of accounts receivable and notes outstanding Chastain-Roberts did not communicate with Owen Roberts.

By February 23, 1974, the total owed according to the plaintiff's summary increased from the December 15 figure of $598,044 to $613,386. Between February 23 and March 22 there was a further increase to a total of $694,440.

On February 1st Consolidated was put back on the "Blank Check" system and checks for purchases for the weeks of February 9 and February 16 were returned for insufficient funds. The amount of those checks is not known to the court. The "Blank Check" system was then stopped but evidently for only a short time because Consolidated's check number 232, dated 4–19–74 for $35,820.73 was returned for insufficient funds. It is a part of the plaintiff's claim.

In March 1974 Chastain-Roberts was selling Consolidated some $80,000 to $85,000 per week. By May 17, 1974, the total owed by Consolidated was down slightly to $675,924.00.

On June 22, 1974, Owen Roberts died from cancer. No representative of the estate of Mr. Roberts participated in Consolidated's management or on its board of directors.

Consolidated continued buying from Chastain-Roberts. On August 29, 1974, the then outstanding total of $779,000 was converted to two promissory notes payable, one for $699,000.00 beginning December 24 at

$3,000.00 per week, and one for $80,000.00 payable in 90 days. As security the corporation conveyed real property, furniture, fixtures, machinery, equipment, and inventory, and Muncy pledged his 1,000 shares of Consolidated. A loan agreement was also signed. By October Consolidated had begun a Chapter XI bankruptcy reorganization proceeding. That resulted in the corporation ceasing to do business on January 22, 1975.

Chastain-Roberts collected some $330,-000.00 as a secured creditor and now seeks to recover the remainder from defendant executor.

As already noted plaintiff has failed to supplement its interrogatory answers to explain the details of and supporting records and books for its large monetary claim. Since this opinion deals only with liability and does not deal with the legal sufficiency of plaintiff's proof of damages, it is unnecessary to attempt to determine the exact amount plaintiff can legally claim.

Robert Muncy in the meantime has been sentenced to imprisonment by an Alabama United States district court for theft of goods moving in interstate commerce, and has filed a bankruptcy petition in the Columbus Division of this court. His discharge is now being opposed. *See* 11 U.S.C. § 32(c). Mr. Muncy has also been sued as a third-party defendant in this civil action.

### COMPETENCY OF MUNCY AS A WITNESS

▇ Upon motion for summary judgment this court may consider only evidence that would be admissible upon the trial of the case. *Roucher v. Traders & General Ins. Co.*, 235 F.2d 423 (5th Cir. 1956). This being a diversity action admissibility is determined by Georgia's rules of witness competency. Rule 601, Federal Rules of Evidence.

Plaintiff's claim for the alleged unpaid stock subscription rests entirely upon the oral testimony of Mr. Muncy, and the re-mainder of plaintiff's claims are substantially weakened if he is incompetent to testify.

▇ Whether or not Mr. Muncy is ultimately discharged in bankruptcy is not material to the question of his competency under state law since incompetency under Georgia's dead man's statute is not removed by discharge in bankruptcy. *Oatis v. Harrison*, 60 Ga. 535 (1878); *Mathis v. Gaskins*, 52 Ga.App. 586, 183 S.E. 822 (1935).

Georgia's dead man's statute, Ga.Code Ann. § 38–1603, as here applicable, provides:

1. Where any suit shall be instituted or defended by a person insane at the time of trial, or by an indorsee, assignee, or transferee, or the personal representative of a deceased person, the opposite party shall not be admitted to testify in his own favor against the insane or deceased person as to transactions or communications with such insane or deceased person whether such transactions or communications were had by such insane or deceased person with the party testifying or with any other person.

\* \* \* \* \* \*

4. Where a person not a party, but a person interested in the result of the suit, shall be offered as a witness, he shall not be competent to testify, if as a party to the cause he would for any cause be incompetent.

\* \* \* \* \* \*

7. When suit shall be instituted against joint defendants, one of whom shall be the representative of an insane or deceased person, the sane or living party defendant shall not be admitted to testify as to any transaction or communication with the insane or deceased party, when his evidence would tend to relieve or modify the liability of the party offered as a witness and tend to make the estate of said insane or deceased party primarily liable for the debt or default.

▇ While Muncy has not been sued by the plaintiff, he is a third-party defendant

and could have been sued by the plaintiff as to all but the unpaid stock subscription claim, the same as the plaintiff is suing defendant executor. Any recovery against defendant executor would diminish the total damages incurred by plaintiff and thus diminish the amount that could be claimed against Mr. Muncy. Mr. Muncy therefore seems to be pecuniarily interested in the outcome of this lawsuit, *Blount v. Beall*, 95 Ga. 182(2), 22 S.E. 52 (1894), and as a potential beneficiary of a recovery by the plaintiff to be testifying in his own favor. As such in this court's best judgment he is incompetent as a witness to transactions or communications with the deceased. No similar Georgia decision having been found, this constitutes this court's prediction of the construction that would be given this statute by the appellate courts of this state. Realizing that the opinions of this court are neither final nor infallible, each claim of the plaintiff will nevertheless be considered as if Mr. Muncy were competent to testify as to transactions or communication with the deceased.

### COUNT I—UNPAID STOCK SUBSCRIPTION

█ Plaintiff seeks to recover $65,000 that Owen Roberts allegedly agreed to pay but never paid for his 1,000 shares of Consolidated stock as issued on January 20, 1971, shortly after the corporation was chartered. Robert Muncy's already quoted deposition testimony is the only evidence of the alleged agreement. There is no writing of any nature or sort evidencing it. As such the alleged oral promise is unenforceable under Georgia's statute of frauds which requires enforceable stock subscription agreements to be in writing. *See* Ga.Code Ann. § 22–504(b). The stock having been actually issued, Georgia nevertheless permits an action for amounts orally agreed to be paid but not paid for the stock. Plaintiff for the benefit of itself and all other creditors may bring such an action. *See* Ga.Code Ann. § 22–601; *Hill & Merry v. Jackson Stores*, 137 Ga. 174, 73 S.E. 13 (1911); *Willson v. Appalachian Oak Flooring & Hardware Co.*, 220 Ga. 599, 140 S.E.2d

830 (1965), and *Coffee System of Atlanta v. Fox*, 226 Ga. 593, 176 S.E.2d 71 (1970).

█ For oral contracts to be enforceable under Georgia law it must be shown that there was a meeting of the minds of the contracting parties—mutuality—as to every essential element of the oral agreement. It must be shown "with reasonable certainty as to what the parties were obligating themselves to do to effect what they envisioned . . .", and "in order for the contract to be valid the agreement must ordinarily be expressed plainly and explicitly enough to show what the parties agreed upon. A contract cannot be enforced in any form of action if its terms are incomplete . . . incomprehensible. . . ." —vague, indefinite or uncertain. *Bagwell-Hughes, Inc. v. McConnell*, 224 Ga. 659, 661, 164 S.E.2d 229, 231 (1968); see also *Gragg v. Hall*, 164 Ga. 628, 139 S.E. 339 (1927).

█ Assuming that Mr. Muncy's testimony is admissible, the court notes that he first testifies as to a number of discussions that took place during the time that he and the deceased were discussing trying to acquire the Penny Wise stores. The date they successfully bid for the stores and took over their operation was December 17, 1970. A corporate charter was not issued until January 11, 1971, and the stock in question was not issued until January 20, 1971. Muncy's testimony in point of time therefore refers to discussions that took place at least a month before the stock in question was issued and almost a month before the corporation even came into being.

Muncy next says that he sold his Gold Platter stock for $15,000 and then contributed cash and properties to the corporation to keep his bargain. Asked how much cash, he said *"right at $15,000"*. (Muncy deposition, p. 20). The words "right at" used in their everyday sense mean "about"; they in reality connote a guesstimate of the money Muncy actually paid into the corporation. If Muncy paid $15,000, his testimony would have been "I put into the corporation a business in Fortson, Georgia, and a laundromat on Forrest Road and . . . $15,000", instead of "and right at $15,000".

Plaintiffs have produced no bank copies of Muncy's check or checks showing his payment for his stock. Neither have they produced bank copies of Consolidated's deposit slips showing a deposit or deposits by Consolidated of money received by Consolidated from Muncy.

Given the opportunity to do so, plaintiffs have produced nothing definite as to the first part of the alleged bargain.

Mr. Muncy ran Consolidated on a day to day basis. Financial statements submitted by him to Chastain-Roberts do not show that anyone contributed more than $10,000 for the stock that was issued. If Muncy did pay $15,000 for his stock, why didn't he cause the financial records kept by him to so indicate and the resulting financial statements to so reflect?

Mr. Muncy next testified about the business in Fortson, Georgia, and the laundromat. As already quoted, when asked about their value he answered "some $50,000". Again, he didn't say $50,000 but instead he said "some $50,000". Asked further if they agreed it was worth $50,000 he continued to equivocate saying finally that Owen Roberts didn't object when he said it was worth $50,000.

The store and laundromat consisting of inventory and equipment were not transferred by Muncy until around April 1. Since the value of grocery inventory that is for sale changes on a day by day basis, what was the value of the inventory on April 1 as compared to the date he mentioned $50,000 and Owen Roberts didn't object? Plaintiff has produced nothing. The same financial records and statements kept by and furnished by Muncy again do not reflect such a contribution by a stockholder or such a value.

Georgia law requires that the board of directors of a corporation by resolution place a value upon property contributed by a stockholder in payment of stock, 1933 Ga.Code Ann. § 22–506(c), upon the date of transfer or stock issuance. *Cf. Crowder v. Electro-Kenetics Corp.*, 228 Ga. 610, 187 S.E.2d 249 (1972). Muncy has never been asked by plaintiff whether or not the board

of directors at the time the store and laundromat were taken over on April 1, put a value on each. If the property were contributed and a $50,000 value placed upon it, the inclusion of the property as having been contributed by a stockholder as capital, would have made Consolidated's financial picture much more attractive to Chastain-Roberts and to the First National Bank. Mr. Muncy wasn't asked by plaintiff about the absence of such information on said statements.

Mr. Muncy's testimony at best is conclusory and lacking in the detail as to each essential element necessary to show that Owen Roberts orally agreed to pay money and contribute property for his Consolidated stock equal to $15,000 money and $50,000 of property contributed by Mr. Muncy. In all respects even construed most strongly in favor of the plaintiff, Mr. Muncy's testimony is vague, indefinite and uncertain. The alleged oral agreement is therefore unenforceable under Georgia law.

## COUNT III—LIABILITY AS DIRECTOR AND OFFICER

■ Under Georgia law directors and officers of a corporation may be adjudged personally liable for dishonored checks of the corporation when it is shown that they were guilty in a civil sense of fraud and deceit in issuing or causing the checks to be issued. *See Superior Paving, Inc. v. Citadel Cement Corp.*, 145 Ga.App. 6, 243 S.E.2d 287 (1978). Officers and directors are and have long been held to be personally liable for fraudulent conduct even when they are acting for the corporation. The rationale for their being individually responsible is that fraud and deceit is a tort which causes a direct and unique injury to a third party, in this instance a creditor, thereby permitting the injured third party to proceed directly and solely in his own behalf against the offending officer or director. *See e. g. Willson v. Appalachian Oak Flooring & Hardware Co.*, 220 Ga. 599, 140 S.E.2d 830 (1965); *Hines v. Wilson*, 164 Ga. 888, 139 S.E. 802 (1927); *Lincoln Land Co. v. Palfery*, 130 Ga.App. 407, 203 S.E.2d 597 (1973).

Other jurisdictions allow actions by individual creditors against corporate fiduciaries for fraud and deceit in connection with the issuance of corporate checks. *See Howells, Inc. v. Nelson,* Utah, 565 P.2d 1147 (1977); *Klockner v. Keser,* 29 Colo.App. 476, 488 P.2d 1135 (1971); *Annot.* 47 A.L.R.3d 1250 (1971).

> The five elements of fraud and deceit in Georgia are: (1) false representation made by the defendant; (2) scienter; (3) an intention to induce the plaintiff to act or refrain from acting in reliance by the plaintiff; (4) justifiable reliance by the plaintiff; (5) damage to the plaintiff.

*City Dodge, Inc. v. Gardner,* 232 Ga. 766, 769–70, n. 1, 208 S.E.2d 794, 797 (1974).

Do the undisputed facts show that as a matter of law Roberts acted fraudulently and deceitfully as to Chastain-Roberts?

The undisputed facts show that at the end of each week Chastain-Roberts filled in Consolidated's blank checks for the dollar amount of groceries already delivered during that week to Consolidated's stores, dated the checks, deposited them and then notified Consolidated of the date and amount of each. The undisputed facts further show that this practice continued week after week after payment was first stopped on one of Consolidated's checks and after Consolidated was past due on its dishonored checks and other substantial obligations. Closely analogous are the facts in *Howell's, Inc. v. Nelson, supra,* at 1149 where the court stated:

> Plaintiff also urges that the defendant should be held personally liable because his issuance of this check was a fraud upon the plaintiff. We have no disagreement with the rule advocated that if an officer of a corporation, even though he purports to be acting for it, commits a fraud upon another, he may be held personally liable therefor. However, in this situation, there are two propositions against finding any fraud upon the plaintiff. *The fact is that the check was given to pay on a past due account.* Therefore, the plaintiff was not induced to give anything of value, nor was it in any way cheated or adversely affected by the giving of the check. As a matter of fact, it could be regarded as having improved the plaintiff's position by raising the form of the obligation one step in dignity as plaintiff would then have its choice of suing on the check, or on the account. The second is the agreement to hold the check for two weeks. The law is that where the maker and payee are aware that there are not funds presently available to pay a check and *it is therefore post-dated,* or agreed to be held, it does not come within the definition of a check, which must be payable on demand, but is *properly regarded as a promise to pay in the future.*

(footnotes omitted) (emphasis added). *Howell's, Inc. v. Nelson* not only points out that there is no inducement or justifiable reliance when a creditor gives value before receiving a check that is dishonored but it also illustrates the general rule that there is no fraud inherent in a promise to pay in the future. Georgia follows this general rule except where it is shown that the promisor at the time of the promise knows that the corporation cannot or will not fulfill the promise. *See, e. g. Nixon v. Brown,* 223 Ga. 579, 157 S.E.2d 20 (1967). The undisputed evidence here shows that Chastain-Roberts gave value by delivering its groceries prior to each of the dishonored checks being filled in and deposited. Chastain-Roberts like the plaintiff in *Howell's, Inc. v. Nelson* "was not induced to give anything of value, nor was it any way cheated or adversely affected by the giving of the[se] check[s]." Plaintiff therefore as a matter of law cannot prove that the defendant's deceased intended to induce the plaintiff to act or refrain from acting.

The checks in question were delivered to Chastain-Roberts with the understanding that each check would be held and filled in with a future date and dollar amount. As such each check was in reality a post-dated check and thus a promise to pay in the future. There being no evidence, direct or circumstantial, that the deceased Owen Roberts promised anything to Chastain-

Roberts or in any way participated in getting groceries delivered in anticipation of these blank checks being honored, plaintiff's proof also fails as a matter of law since there can be no fraud inherent in these blank check promises to pay in the future and there is no evidence to bring the conduct of the deceased within the exception to the rule.

In addition there is no evidence, direct or circumstantial, to prove that the deceased Owen Roberts ever made any representation, true or false, to Chastain-Roberts.

In reality Chastain-Roberts had no contact whatsoever with Owen Roberts and in no way relied upon Owen Roberts in selling groceries on credit to Consolidated. As such defendant is entitled to a judgment as a matter of law on this count.

## COUNT IV—BREACH OF FIDUCIARY DUTY

 The plaintiff in its own behalf seeks to hold the estate liable for Roberts' alleged negligent mismanagement of Consolidated. It is true that an officer or a director, even an inactive one, owes a fiduciary duty of good faith and due care to the corporation. *See Woodward v. Stewart*, 149 Ga. 620, 101 S.E. 749 (1919); *McEwen v. Kelly*, 140 Ga. 720, 79 S.E. 777 (1913); Ga. Code Ann. § 22–713. In some cases a judgment creditor may maintain an action for a breach of the duty; however, in the first instance, the duty is one owed to the corporation which possesses the cause of action for breach of that duty.

 In general an action for mismanagement against corporate fiduciaries should be brought by the corporation or for its benefit and not by a single creditor in its own behalf. *See Sutton v. Reagan & Gee*, 405 S.W.2d 828 (Tex.Civ.App.1966); 3A

*Fletcher Cyclopedia Corp.*, § 1181 (1975); 19 Am.Jur.2d Corporations § 1350 (1965). While Georgia has never explicitly adopted this view, it represents the better reasoned rule since it avoids the possibility of double liability on the director or officer. *See Sutton v. Reagan & Gee, supra.* Therefore, Super Valu is not the proper party to bring this action.

The cases cited by the plaintiff do not support its right to pursue this claim in its own behalf. Those cases which plaintiff contends allow a creditor to bring a direct suit against an officer or director for mismanagement were actually brought by representatives of the corporation. *See McEwen v. Kelly, supra.* (Action by trustee in bankruptcy for benefit of corporation); *Woodward v. Stewart, supra.* (Action by receiver of insolvent corporation).[3] The plaintiff also contends that this case falls within the rule of *Davis v. Ben O'Callaghan Co.*, 238 Ga. 218, 232 S.E.2d 53 (1977), wherein the Georgia Supreme Court allowed an action by a single judgment creditor directly against a corporate officer under Ga.Code Ann. § 22–714. Although the plaintiff maintains that it is not proceeding under § 22–714, which in general requires that actions for mismanagement against directors and officers should be brought for the benefit of the corporation, it contends that *Davis* recognizes actions by individual creditors. None of the exceptions of *Davis* apply to this case. In *Davis* the defendant, president of the corporation, had established an escrow fund to pay the plaintiff-creditor; however, he had appropriated the fund to pay other creditors. *See Davis v. Ben O'Callaghan Co.*, 139 Ga.App. 22, 227 S.E.2d 837 (1976). The court held that there was a special contractual relationship between the parties which warranted a di-

---

**3.** In *Greenwood v. Greenblatt*, 173 Ga. 551, 161 S.E. 135 (1931), the Supreme Court stated:

An action against the directors or officers of a corporation for losses happening to it in consequence of their gross negligence, their habitual inattention to their duties, or their fraud or mismanagement, must be brought by the trustee in bankruptcy of the corporation. *Id.* at 558, 161 S.E. at 139.

This supports the conclusion that an action for mismanagement must be brought by the corporation or for its benefit. *See also Green v. Perryman*, 186 Ga. 239, 197 S.E. 880 (1938) (superintendent of banks is proper party to bring action for negligent mismanagement against bank officers and directors).

rect action against the corporate officer. In the case at hand, there is no similar special contractual relationship. There was no special fund promised to the plaintiff; the plaintiff was simply a creditor who was paid with blank checks that were dishonored.

Even if the court were to allow the plaintiff to maintain the suit, it could not prevail on the merits.

Roberts' negligence, if any, was not the proximate cause of the plaintiff's loss. Chastain-Roberts' injury resulted from Chastain-Roberts continuing to supply merchandise and Chastain-Roberts' completing and depositing bad checks when Consolidated was not meeting its current obligations to Chastain-Roberts. This situation continued over an extended period when the plaintiff's predecessor knew that prior checks had been dishonored and when it knew there were not sufficient funds in Consolidated's account to cover the checks. By supplying the merchandise Chastain-Roberts accepted a risk that Consolidated would never be able to pay its past due obligations. It was a conscious arms length undertaking that failed to yield the desired result—Consolidated's return to solvency. The plaintiff was the author of its own misfortune and cannot recover from the estate of this officer and director.

Finally it is worth noting that the fiduciary duty is owed to the corporation and it is uncertain that Roberts breached this duty since the corporation was not harmed, at least in the short run. In fact the blank check transactions helped sustain the corporation for a period giving it a chance to survive.

Defendant is therefore also entitled to a judgment as a matter of law on this count.

Accordingly, defendant's motions for summary judgment on Counts I, III, and IV are granted and on Count II for the reasons heretofore stated defendant is entitled to a judgment in its favor.