Cecil L. PHARR and Robert A.
Browne, Plaintiffs,

v.

OLIN CORPORATION, Defendant.

Civ. A. No. 1:86–CV–708–JTC.

United States District Court,
N.D. Georgia,
Atlanta Division.

June 5, 1989.

Douglas Richard Powell, Fortson & White, Atlanta, Ga., Walter Carlton Alford, Tucker, Ga., and Andrew J. Hinton, McGee & Oxford, Atlanta, Ga., for plaintiffs.

Leslie A. Dent and W. Lyman Dillon, Hansell & Post, Atlanta, Ga., for defendant.

## ORDER

CAMP, District Judge.

This action comes before the Court on defendant's Motion for Summary Judgment, defendant's Second Motion for Summary Judgment, defendant's Motion for Rule 11 Sanctions, plaintiffs' Motion for Rule 11 Sanctions, and plaintiffs' Motion for Summary Judgment. For the reasons detailed below, defendant's Motion for Summary Judgment is GRANTED, defendant's Second Motion for Summary Judgment is GRANTED IN PART AND DENIED IN PART, defendant's Motion for Rule 11 Sanctions is DENIED, plaintiffs' Motion for Rule 11 Sanctions is DENIED, and plaintiffs' Motion for Summary Judgment is DENIED.

## I. *Facts*

Plaintiffs Cecil Pharr and Robert Browne formed an entity known as Browne and Pharr Makers, Inc. with Mr. Browne and Mr. Pharr as principals, in order to sell and distribute reproductions of the double-bar-reled Parker or Parker Brothers shotgun. In 1981, Browne and Pharr approached defendant Olin Corporation (hereinafter "Olin") and presented a proposal to David Mathewson, Jr., Olin's Business Manager, for the manufacture of the Parker reproduction shotguns.

At Olin, Mr. Mathewson was "responsible for the promotion and marketing of the Japanese produced Winchester Firearms in the United States market." Mathewson dep. at 6. While Mathewson lacked the authority to enter into contracts on Olin's behalf, he did possess the authority to negotiate terms and provisions of prospective contracts. *Id.* at 16–17. Browne and Pharr's dealings with Olin were almost exclusively through Mathewson. Mathewson was receptive to Browne and Pharr's ideas concerning the Parker reproduction shotguns and soon authorized employees at the Olin plant in Japan to begin researching the project. *Id.* at 75–78. In the meantime, Browne and Pharr worked to acquire the rights to the Parker trademark and tradename. Browne aff. ¶ 15.

In November of 1981, Browne, Pharr, Mathewson, and Larry Larsen, Olin's Director of New Product Development, met in Mathewson's office to discuss tooling costs, the cost related to gun cases, the cost of the wood for the stock of the shotgun, prototypes, and other matters related to the reproduction project. *Id.* ¶ 19. On March 8, 1982, Mathewson sent Browne a document entitled "General Terms and Conditions Proposed 'Parker' Contract." Exhibit "A" attached to Browne's affidavit. The cover letter from Mathewson indicated that the document was a summary of key points which Olin was working on relative to a contract for the manufacture of the Parker reproductions. The document provided in pertinent part:

It is our intention to manufacture and your intention to purchase a yet to be determined number of Parker type shotguns during the life of the contract. Volumes are assumed to be in the area of 6,000 units per year....

You agree to the payment of U.S. $80,-000 for the development of four prototype firearms.... It is further agreed that we will require payment of the U.S. dollar equivalent of Yen 150,000,000 to be used for the purchase of unique tooling and special machinery dedicated to the manufacture of the Parker gun.

*Id.*

Not long after Mathewson sent the document to Browne, he telephoned Browne to inform him that Olin's Executive Committee had altered their proposal. Olin now demanded more money for the retooling and required that Browne and Pharr provide a letter of credit or some other financial guarantee to ensure they were capable of meeting the terms of the contract. Mathewson dep. at 130; Browne aff. ¶ 23. The telephone conversation between Mathewson and Browne, which took place in late March or early April of 1982, spawned this litigation. While both parties agree that Browne told Mathewson that he and Pharr could not meet Olin's most recent demands, the accounts given by Mathewson and Browne as to what transpired next, differ considerably. Mathewson dep. at 135; Browne dep. at 37.

Plaintiffs contend that Mathewson and Browne formed an oral contract whereby Olin would compensate Pharr and Browne for the value of bringing to Olin, a buyer for the Parker reproduction shotguns. Plaintiffs rely on Browne's account of the telephone conversation:

> My [Browne] response to that was, we have both got a problem. Since we can't do it, meaning our group, Browne & Pharr, Makers, Inc., suppose Cecil [Pharr] and I put our heads together ... possibly we could find someone else as an alternate who could enter into the picture and meet the stipulations that Winchester [Olin] had established and buy the guns.
>
> Dave's [Mathewson] response was, that would be a good idea. I said, if we find someone who meets the criteria, will you do a deal with us. His response was, yes, subject to their meeting the stipulations that Olin had set down....

The conversation ended on a hopeful note that, okay, Cecil and I will get together and see if we can locate someone who can meet the stipulations; if so, we will bring them to you, and we'll do a deal. We parted at that point in time with a good luck and let's do it.

Browne dep. at 38–39.

Conversely, defendant asserts that no such oral agreement was ever reached. In support of that contention, defendant relies on Mathewson's account of the conversation:

> Q. Do you recall any specific conversation where Mr. Browne offered, if his group could not do the deal, to find someone to do the deal based on terms acceptable to Olin?
>
> A. We did have a conversation along those lines.... Mr. Browne's comments generally were that this is beyond the capabilities of Browne and Pharr Makers and our current backers. If we have backing that is acceptable to Olin, would you be willing to continue the deal? At which point I said yes.
>
> Q. Do you remember specifically the language used by either you or Mr. Browne in that conversation?
>
> A. Best of my recollection, and I believe it is quite clear on this point, was that if we bring somebody in that has financial resources satisfactory to Olin, will you still be willing to do the deal?

Mathewson dep. at 135–36.

Both sides do agree that the subject of a commission was never broached. The following colloquy took place at Mr. Browne's deposition:

> Q. He [Mathewson] never said to you, if you do x, I'm going to pay you x commission or x fee?
>
> A. No.
>
> .    .    .    .    .
>
> Q. Now there was no discussion at any time between you and Mr. Mathewson, one, about whether it would be a flat fee or a commission; is that correct?
>
> A. Correct.
>
> Q. Two, over what period of time or when it would be paid?

A. Correct.

Q. Three, as to what amount would be paid?

A. Correct.

Q. Four, as to any other term or condition of payment, correct?

A. Not until he and Cecil sat down, but that was after the deal. So if you qualified your question to that point, yes.

*Id.* at 45–46, 49–50. *See also* Mathewson dep. at 167.

Subsequent to the telephone conversation, Browne and Pharr introduced Thomas Skeuse, president of Reagent Chemical and Research, Inc., to Mathewson at Olin's headquarters. Mathewson dep. at 139; Browne aff. ¶ 30. Negotiations on the Parker reproduction project thereafter proceeded between Mathewson and Skeuse. On February 23, 1983, Reagent and Olin entered into a written contract by which Olin agreed to manufacture and sell to Reagent, the Parker gun replicas. *See* Exhibit "A" attached to Brief in Support of Defendant Olin Corporation's Second Motion for Summary Judgment. Reagent and Olin were the only signatories to the Olin/Reagent contract.

During the negotiations between Olin and Reagent, Browne and Pharr conveyed their interest in the Parker trademark rights to Reagent. Browne and Pharr Makers, Inc., through Cecil Pharr, then signed a contract with Reagent on July 27, 1982:

Browne and Pharr, Makers, Inc. ("B and P") and Cecil Pharr, Jr. ("Pharr") spent considerable time on the Parker Gun project. B and P and Pharr both irrevocably assign and set over to Reagent Chemical & Research, Inc. ("Reagent") all of their rights in and to the Parker Gun project.

Exhibit "A" attached hereto.

Pursuant to the assignment agreement and a subsequent letter agreement, Reagent paid Browne and Pharr, Makers $125,-000.00. The letter agreement provided that "[t]his payment shall be in full settlement of any and all claims that B and P and Pharr shall have by reason of a certain agreement dated February 23, 1983 between Reagent and Olin Corporation and any guns purchased or sold by Reagent under that agreement." Exhibit "B" attached to Brief in Support of Defendant Olin Corporation's Motion for Summary Judgment.

In February of 1984, Pharr approached Mathewson and demanded a 3% commission on the $12,000,000.00 which allegedly represents Olin's sale to Reagent of 12,000 Parker Reproduction guns at $1,000.00 each. Mathewson dep. at 167. Olin eventually refused to pay Browne and Pharr any such commission, prompting plaintiffs to file this lawsuit. Defendant now moves for summary judgment on plaintiff's oral contract claim as well as plaintiffs' claims in quantum meruit, misrepresentation, and abusive litigation. The Court will address each claim in seriatim.

## II. *Summary Judgment Standard*

Rule 56(c), Fed.R.Civ.P., defines the standard for summary judgment: Courts should grant summary judgment when "there is no genuine issue as to any material fact ... and the moving party is entitled to judgment as a matter of law." In *Celotex Corp v. Catrett*, 477 U.S. 317, 325, 106 S.Ct. 2548, 2554, 91 L.Ed.2d 265 (1986), the Supreme Court interpreted Rule 56(c) to require the moving party to demonstrate that the nonmoving party lacks evidence to support an essential element of his claim. Thus, the movant's burden is easily "discharged by showing—that is, pointing out to the district court—that there is an absence of evidence to support the nonmoving party's case." Once the movant has met this burden, the opposing party must then present evidence establishing a material issue of fact. *Id.* The nonmoving party must go beyond the pleadings and submit evidence in the form of affidavits, depositions, admissions and the like, to demonstrate that a genuine issue of material fact does exist. *Id.* The Supreme Court stated in *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 257, 106 S.Ct. 2505, 2514, 91 L.Ed. 2d 202 (1986), "that the plaintiff, to survive the defendant's motion, need only present

evidence from which a jury might return a verdict in his favor. If he does so, there is a genuine issue of fact that requires a trial."

While all evidence and factual inferences are to be viewed in a light most favorable to the nonmoving party, *Rollins v. Techsouth, Inc.*, 833 F.2d 1525, 1529 (11th Cir. 1987); *Everett v. Napper*, 833 F.2d 1507, 1510 (11th Cir.1987), "the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Anderson*, 477 U.S. at 248, 106 S.Ct. at 2510. An issue is not genuine if it is unsupported by evidence, or if it is created by evidence that is "merely colorable" or is "not significantly probative." *Id.* at 250, 106 S.Ct. at 2511. Similarly, a fact is not material unless it is identified by the controlling substantive law as an essential element of the nonmoving party's case. *Id.* at 248, 106 S.Ct. at 2510. Thus, the party opposing the summary judgment must come forward with specific evidence of every element essential to his case so as to create a genuine issue of material fact for trial. *Celotex*, 477 U.S. at 323, 106 S.Ct. at 2552; *Rollins*, 833 F.2d at 1528.

## III. *The Oral Contract*

■ Georgia law[1] provides for the enforcement of oral contracts: "Simple contracts may either be in writing or rest only in words as remembered by witnesses." O.C.G.A. § 13–1–5(b). Like written contracts, oral contracts must be certain and definite in their terms. In *Super Valu Stores, Inc. v. First National Bank of Columbus, Georgia*, 463 F.Supp. 1183, 1193 (M.D.Ga.1979), the court stated:

For oral contracts to be enforceable under Georgia law it must be shown that there was a meeting of the minds of the contracting parties—mutuality—as to every essential element of the oral agreement. It must be shown 'with reasonable certainty as to what the parties were obligating themselves to do to effect what they envisioned ...', and 'in order for the contract to be valid the agreement must ordinarily be expressed plainly and explicitly enough to show what the parties agreed upon. A contract cannot be enforced in any form of action if its terms are incomplete ... incomprehensible....'—vague, indefinite or uncertain. *Bagwell–Hughes, Inc. v. McConnell*, 224 Ga. 659, 661, 164 S.E.2d 229, 231 (1968).

Similarly, in *King v. State Farm Mutual Automobile Insurance Company*, 117 Ga. App. 192, 194, 160 S.E.2d 230 (1968), the Georgia Court of Appeals found that an oral agreement which failed to provide for the amount of compensation or the time such compensation would be due, lacked the essential elements of a contract and was therefore "too indefinite to be enforceable."

■ "The construction of a contract is a question of law for the court. Where any matter of fact is involved, the jury should find the fact." O.C.G.A. § 13–2–1. There is a factual dispute as to what exactly transpired during the telephone conversation between Browne and Mathewson. However, the disputed facts are not material to plaintiffs' case. Assuming arguendo that Browne's recollection of his telephone conversation with Mathewson is accurate, the Court nevertheless finds that there was no any meeting of the minds and conse-

1. Georgia courts have adopted the rule of "lex loci contractus:" The law of the state where the last act essential to the creation or completion of the contract occurs, is the law that governs the dispute. *Geico v. Dickey*, 255 Ga. 661, 340 S.E.2d 595 (1986); *General Telephone Company of the Southeast v. Trimm*, 252 Ga. 95, 311 S.E.2d 460 (1984). The telephone conversation which allegedly gave rise to the oral contract, was conducted between Browne, who was in Georgia, and Mathewson, who was in Illinois. As it is unclear where the last act essential to the alleged oral contract took place, either Georgia or Illinois law may govern. Both states require that oral contracts be definite and certain, therefore, the Court will only address the sufficiency of the contract under Georgia law. *See, e.g., Brewer v. Daubert Chemical Co.*, 72 Ill.App.3d 718, 28 Ill.Dec. 911, 915, 391 N.E.2d 110, 114 (1979) ("An agreement which is indefinite and lacks specificity cannot be enforced as a contract."); *Lee Shell Co. v. Model Food Center, Inc.*, 111 Ill.App.2d 235, 250 N.E.2d 666 (1969).

quently, no contract. The "terms" of the alleged agreement were vague and indefinite, and cannot constitute an enforceable oral contract.

Browne himself admits that there was never any discussion of compensation by way of commission or otherwise. *See supra* p. 1572. Plaintiffs argue, however, that an agreed upon price is not always a necessary prerequisite to the formation of a contract: O.C.G.A. § 13–2–2(3) provides that to arrive at the true interpretation of contracts, "[t]he custom of any business or trade shall be binding only when it is of such universal practice as to justify the conclusion that it became, by implication, a part if the contract...." Plaintiffs assert that pursuant to O.C.G.A. § 13–2–2(3), evidence that it is the custom in the firearms industry to pay a reasonable commission can make definite an otherwise inchoate agreement.

■ The Court disagrees, at least in part. A contract, otherwise enforceable, need not always contain an agreement as to price. *Jackson v. Meadows et al.*, 153 Ga.App. 1, 2, 264 S.E.2d 503 (1980). A deeply rooted industry-wide custom may step in and establish a reasonable fee for services rendered. Similarly, once a brokerage agreement has been made, evidence that it is custom in the industry to pay brokers a commission to locate a purchaser, may enable a court to find an enforceable contract. *Ramey v. Sturgeon*, 17 Ga. App. 292, 86 S.E. 660 (1915). Evidence of custom in the industry cannot, however, be used to form the contract itself. *Newark Fire Ins. Co. v. Smith*, 176 Ga. 91, 94, 167 S.E. 79 (1932) (quoting *National Savings Bank v. Ward*, 100 U.S. 195, 206, 25 L.Ed. 621 (1880) ("Where there is no contract, proof of usage will not make one.").

In this case, plaintiffs have argued that *"once a seller of firearms agrees to hire a broker to locate a purchaser of those firearms* [2], it is implied that a commission will be paid for the services rendered." Plaintiffs' Response to Defendant Olin Corporation's Motion for Summary Judgment p. 17. (emphasis added). The Court agrees. The problem in this case, however, is that there is little evidence that Olin ever agreed to hire plaintiffs as brokers. Custom cannot step in and establish whether, in the first instance, the seller has ever agreed to hire plaintiffs as brokers. Browne's testimony that such an arrangement was "understood" [3] does not constitute a contract which can be made definite through evidence of industry custom.

The custom argument is further weakened by the course of dealing between plaintiffs and defendant prior to the Mathewson–Browne telephone conversation. Although it may be custom in the firearms industry for sellers to use brokers to find willing purchasers, the relationship between plaintiffs and defendant was that of prospective buyer and seller. Olin was going to retool their plant in Japan to enable it to manufacture the Parker reproduction shotguns. Plaintiffs were to help fund the retooling and then purchase the product. *See supra* pp. 1570–1571. This buyer-seller posture lasted from December 1980 when plaintiffs first approached Olin with their idea for the Parker reproductions until at least the March/April 1982 telephone conversation. During that period, Browne and Pharr hoped to market the guns themselves for a profit.

Browne testified on deposition that he asked Mathewson, during the telephone conversation, whether plaintiffs "could find someone else as an alternate who could enter into the picture and meet the stipulations that Winchester had established and

---

**2.** Plaintiffs have submitted affidavits to support their contention that it is custom in the firearms industry for sellers to pay commissions to brokers who find them willing buyers. *See* affidavits of Sanford L. Brygider and Scott Hamilton Austin.

**3.** The following exchange took place during Browne's deposition:

Q. In your conversation with Mr. Mathewson in late March or early April ... did you ever tell Mr. Mathewson that if you brought somebody into the deal, you would expect a fee?
A. No, I felt that to be understood as it is in any business where someone agrees to do a deal....

buy the guns. Dave's [Mathewson] response was, that would be a good idea. I said, if we find someone who meets the criteria, will you do a deal with us." Browne dep. at 38; *See supra*, p. 1571. Given the year long buyer-seller course of dealing and even assuming that Browne's recollection is accurate, the Court cannot conclude that a reasonable person in Mathewson's position would have understood those words to bind Olin to a brokerage agreement. Lacking definite and certain terms, there was never a meeting of the minds and therefore, no enforceable oral contract. Browne's testimony does not demonstrate with reasonable certainty that there was "mutuality as to every essential element of the oral agreement." *Super Valu Stores*, 463 F.Supp. at 1193. Consequently, defendant's Motion for Summary Judgment on the issue of the oral contract is GRANTED.

## IV. *Quantum Meruit*

Plaintiffs have also asserted a claim for quantum meruit and Olin has responded with a motion for summary judgment on that count as well. Both Georgia and Illinois recognize the right to recover in quantum meruit. *See* O.C.G.A. § 9–2–7; *Coldwell Banker Commercial Group, Inc. v. Nodvin*, 598 F.Supp. 853 (N.D.Ga.1984), *aff'd*, 774 F.2d 1177 (11th Cir.1985); *Rutledge v. Housing Authority of the City of East St. Louis*, 88 Ill.App.3d 1064, 44 Ill.Dec. 176, 411 N.E.2d 82 (1980). The Court finds that material issues of fact remain as to whether plaintiffs rendered a service to defendant which was then accepted by defendant, and gave rise to an implied promise of compensation. Therefore, defendant's Motion for Summary Judgment on plaintiffs' claim in quantum meruit is hereby DENIED.

## V. *Misrepresentation*

Plaintiffs' Amended Complaint contained the following allegation of misrepresentation:

The plaintiffs then [during the Mathewson–Browne telephone conversation] suggested to Dave Mathewson that since they could not meet the contract requirements of the defendant, would the defendant enter into a contract with some third party that could meet the defendant's contract demands and that otherwise was acceptable to defendant. Mr. Mathewson, on behalf of the defendant, stated that he would be very interested in pursuing that option, and the plaintiffs asked Mr. Mathewson, on behalf of the defendants [sic], if the defendant would compensate the plaintiffs for the value of bringing such a new party purchaser to the defendant. The plaintiffs were assured by Mr. Mathewson that if they were able to procure such a substitute purchaser that they would receive fair compensation.

. . . . .

Plaintiffs further show that they detrimentally relied upon the representations by the defendant ... and that said representations were not made in good faith and were made with the intent to wrongfully induce the plaintiffs to act to their detriment.... Thus the plaintiffs are entitled to additional damages as prescribed by law for the wrongful misrepresentations made by the defendant and relied upon by plaintiff.

Amended Complaint ¶ 30 & ¶ 42.

Olin has moved for summary judgment on plaintiffs' claim of misrepresentation. In Georgia, fraudulent misrepresentation consists of five elements: (1) a false representation; (2) scienter; (3) an intention to induce plaintiff to act in reliance upon the misrepresentation; (4) justifiable reliance by plaintiff; and (5) damage. *Shaw v. Cook County Federal Savings & Loan Association*, 139 Ga.App. 419, 420, 228 S.E. 2d 326 (1976); *City Dodge, Inc. v. Gardner*, 232 Ga. 766, 769 n. 1, 208 S.E.2d 794, 797 n. 1 (1974).[4] Thus, to satisfy the first two elements of their cause of action, plain-

---

**4.** The elements of misrepresentation are similar in Illinois: "for a statement of a person to constitute the tort of misrepresentation it must be (1) of a material nature, (2) untrue, (3)

known by the person making it to be untrue, believed by him to be untrue, or made in culpable ignorance of its truth or falsity, (4) relied on by the victim to his detriment, (5) made for the

tiffs must prove that defendant knowingly mislead them. Although plaintiffs alleged a knowing misrepresentation in their Amended Complaint, Olin has pointed out to the Court that plaintiffs lack the evidence to support those two essential elements of fraud. Specifically, defendant cites to Browne's own deposition testimony in which he admits that neither he nor Mathewson ever broached the subject of a fee or commission:

Q. He [Mathewson] never said to you, if you do x, I'm going to pay you x commission or x fee?

A. No.

. . . . .

Q. Now there was no discussion at any time between you and Mr. Mathewson, one, about whether it would be a flat fee or a commission; is that correct?

A. Correct.

Browne dep. at 45–46, 49–50.

To survive a motion for summary judgment, the nonmoving party must go beyond the pleadings and submit evidence in the form of affidavits, depositions, admissions and the like, to demonstrate that a genuine issue of material fact does exist. *Celotex Corp.*, 477 U.S. at 325, 106 S.Ct. at 2554. In his affidavit, Browne never states that Mathewson assured him of compensation. Rather, Browne states that "[b]ased upon Mr. Mathewson's statement to me that Olin Corporation would 'do a deal' with Cecil Pharr and me if we identified another purchaser and based upon Cecil Pharr and my understanding of how verbal agreements are common in the firearms industry and further based upon the custom of reasonable commissions being paid in the firearms industry for services rendered, I was led to believe we would be compensated by Olin Corporation for our services...." Browne aff. ¶ 27. Neither Mathewson's statement that Olin could "do a deal" nor Browne's knowledge of custom in the firearms industry constitutes a knowing misrepresentation on the part of Olin.

▮ While it is true that fraud may be proved by either direct or circumstantial evidence, plaintiff is still required to prove

every element of the cause of action. *Marshall v. W.E. Marshall Company et al.*, 189 Ga.App. 510, 513, 376 S.E.2d 393 (1988); *Oltmer*, 49 Ill.Dec. at 654, 418 N.E.2d at 508. In this case, plaintiffs have not produced enough evidence, either direct or circumstantial, to survive defendant's Motion. Browne's affidavit speaks of only custom in the firearms industry and Mathewson's indication that they could "do a deal." Browne aff. ¶ 27. Such does not constitute evidence of a knowing misrepresentation designed to induce reliance.

Plaintiffs' reliance on *Semegen v. Weidner*, 780 F.2d 727 (9th Cir.1985), is misplaced. There, the court noted that defendant's affidavit could not be disregarded because of a prior inconsistent statement. *Id.* at 733. The affidavit and prior inconsistent statement created a genuine issue of material fact. *Id.* Conversely, in the case at bar, there are no inconsistent statements: the only allegation of a knowing misrepresentation is found in plaintiffs' Amended Complaint. The evidence in the record fails to support and in fact, contradicts the allegations in the Amended Complaint. Plaintiffs cannot rely on their pleadings alone to defeat Olin's Motion for Summary Judgment. *See Van T. Junkins and Associates, Inc. v. U.S. Industries, Inc., et al.*, 736 F.2d 656, 658 (11th Cir. 1984). Plaintiffs have failed to come forward with specific evidence of every element essential to their case so as to create a genuine issue of material fact for trial. *Celotex*, 477 U.S. at 323, 106 S.Ct. at 2553; *Rollins*, 833 F.2d at 1528. Therefore, defendant's Motion for Summary Judgment on plaintiffs' claim of misrepresentation is GRANTED.

### VI. *Abusive Litigation*

▮ Defendant filed a counterclaim in this action alleging that *if* the Court finds that an agency relationship existed between Olin and plaintiffs, then plaintiffs undertook duties inconsistent with the alleged agency relationship by acting as Reagent's agents in the same transaction. Based on this improper dual agency and consequent breach of plaintiffs' fiduciary

purpose of inducing the reliance, and (6) such that the victim's reliance led to his injury." *Olt-*

*mer v. Zamora et al.*, 94 Ill.App.3d 651, 49 Ill. Dec. 652, 654, 418 N.E.2d 506, 508 (1981).

duty to Olin, defendant contends that it is entitled to recover the amounts paid to plaintiffs by Reagent in connection with the Parker gun project. In response, plaintiffs have filed a claim for abusive litigation based on *Yost v. Torok,* 256 Ga. 92, 344 S.E.2d 414 (1986), and a Motion for Summary Judgment as to defendant's counterclaim. Olin has moves for summary judgment on plaintiffs' claim of abusive litigation. The Court will first address the merits of plaintiffs' Motion for Summary Judgment on defendant's counterclaim.

Olin filed a counterclaim alleging that it was entitled to any compensation plaintiffs received from Reagent. In support of their Motion for Summary Judgment on the counterclaim, plaintiffs contend that no improper dual agency existed because any actions or representations made by Browne and Pharr were with the full consent and knowledge of both Reagent and Olin. Moreover, plaintiffs maintain that they acted not as an agent for either party, but as middlemen without discretion. The Court concludes that material issues of fact remain unresolved; primarily, whether a promise to pay plaintiffs as Olin's agents was raised by implication. *See, e.g., Lewis v. Citizens & Southern National Bank et al.,* 139 Ga.App. 855, 858–59, 229 S.E.2d 765 (1976); *Harris v. Underwood et al.,* 208 Ga. 247, 250, 66 S.E.2d 332 (1951); *Mitcham et al. v. Singleton,* 50 Ga.App. 457, 178 S.E. 465 (1935).

Just as with plaintiffs' theory of quantum meruit, a quasi-contract not requiring an actual agreement, the law allows an agency relationship to arise by implication, without an express agreement. Moreover, "[t]he acceptance of benefits flowing from acts of an agent is 'implied ratification' whether the principal intends to ratify the agency or not." *Lewis,* 139 Ga.App. at 859, 229 S.E.2d 765. If a principal-agent relationship did arise between Olin and plaintiffs, material issues of fact still remain as to whether Olin knew and consented to the dual agency. Consequently, Plaintiffs' Motion for Summary Judgment as to defendant's counterclaim is DENIED.

As is evident from the above discussion, Olin had a solid legal basis and good faith argument for its counterclaim against plaintiffs. Defendant's Motion for Summary Judgment on plaintiffs' *Yost* claim for abusive litigation is GRANTED.

### Conclusion

Defendant's First Motion for Summary Judgment on the issue of the oral contract is GRANTED. Defendant's Second Motion for Summary Judgment is GRANTED IN PART AND DENIED IN PART: defendant's Motion for Summary Judgment on plaintiffs' claim in quantum meruit is DENIED, defendant's Motion for Summary Judgment on plaintiffs' claim of misrepresentation is GRANTED, and defendant's Motion for Summary Judgment on plaintiffs' *Yost* claim for abusive litigation is GRANTED. Plaintiffs' Motion for Summary Judgment as to defendant's counterclaim is DENIED. Plaintiffs' Motion for Rule 11 Sanctions is DENIED as is defendant's Motion for Rule 11 Sanctions. The Court finds that neither party violated the letter or spirit of the Rule.

SO ORDERED.